Vol. 1181

COURT OF CRIMINAL APPEALS NO. _CR 01-0296_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF ___MONTGOMERY___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC 2001 359___

CIRCUIT JUDGE ___REESE___

Type of Conviction / Order Appealed From: ___ROBBERY I___

Sentence Imposed: ___DOC FOR LIFE___

Defendant Indigent: ■ YES    ☐ NO

CURTIS LAMARIO ANDERSON

NAME OF APPELLANT

| MACEO KIRKLAND | 261-6200 |
|---|---|
| (Appellant's Attorney) | (Telephone No.) |
| 529 S PERRY ST STE 14h | |
| (Address) | |

MONTGOMERY    AL    36104
(City)    (State)    (Zip Code)

V.

### STATE OF ALABAMA

NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)




EXHIBIT
A

# I N D E X

## CLERK'S RECORD

| | |
|---|---|
| CASE ACTION SUMMARY | 1-5 |
| AFFIDAVIT FROM DISTRICT COURT | 6 |
| TRANSCRIPT TO CIRCUIT COURT FROM DISTRICT COURT | 7 |
| INDICTMENT | 8-9 |
| AFFIDAVIT OF INDIGENCY AND ORDER | 10 |
| NOTICE OF DISCOVERY TO DEFENDANT, INTENT TO USE PRIOR CONVICTIONS, INTENT TO INVOKE SENTENCING ENHANCEMENTS, INTENT TO OFFER PROOF BY A CERTIFICATE OF ANALYSIS, AND MOTION FOR DISCOVERY BY THE STATE | 11-12 |
| ORDER FOR OUTPATIENT MENTAL EVALUATION | 13-16 |
| LETTER TO DEFENDANT FROM CLINICAL PSYCHOLOGISTS | 17-18 |
| JURY STRIKE LIST | 19-20 |
| STATE'S REQUESTED JURY INSTRUCTIONS | 21-25 |
| JURY VERDICT | 26 |
| TRANSCRIPT OF RECORD CONVICTION REPORT | 27 |
| NOTICE OF APPEAL | 28-29 |
| MOTION TO WITHDRAW AS COUNSEL, APPOINT APPELLATE COUNSEL AND SET APPEAL BOND | 30-31 |
| CERTIFICATE OF APPEAL | 32 |
| MOTION FOR JUDGMENT OF ACQUITTAL OR IN THE ALTERNATIVE FOR NEW TRIAL OR ARREST OF JUDGMENT | 33-34 |
| ORDER APPOINTING ATTORNEY ON APPEAL | 35 |
| COURT OF CRIMINAL APPEALS DOCKETING STATEMENT | 36-37 |

## PAGE 2

REPORTER'S TRANSCRIPT ORDER                          38

EXHIBIT INDEX                                        39

EXHIBITS                                          40-50

CERTIFICATE OF COMPLETION AND TRANSMITTAL OF
RECORD ON APPEAL BY TRIAL CLERK                      51

```
ACR0372                ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2001 000358 70
OPER: PHA                        CASE ACTION SUMMARY               RUN DATE:
PAGE:   1                         CIRCUIT   CRIMINAL
```

IN THE CIRCUIT COURT OF MONTGOMERY

STATE    OF ALABAMA                        ANDERSON CURTIS LEONARD
                                           3058
CASE: CC 2001 000358 70                    MONTGOMERY, AL  36105 0000

DOB: 04/25/1965
SSN: 417085787   ALIAS NAMES:
CHARGE01: ROBBERY 1ST              COD01: ROB: LIT: ROBBERY 1ST    TYP: F /C: 001
OFFENSE DATE: 10/26/2000                   AGENCY/OFFICER: A030100

DATE WAR/CAP ISS:                          DATE ARRESTED: 12/24/2000
DATE    INDICTED: 03/09/2001               DATE   FILED: 03/13/2001
DATE    RELEASED: 01/05/2001               DATE HEARING: ANDERSON JOHN L.
BOND       AMOUNT:  $30,000.00 P           SURETIES:

DATE 1:           DESC:                     TIME: 0000
DATE 2: 03/22/2001 DESC: APPT               TIME: 0200 P

TRACKING NOS: DC 2001 000358 00  /

DEF/ATY: *James Porter*          TYPE: *A*                            TYPE:

                     00000                    Sept 24 *[handwritten]*  ~~June 18~~ ✓
                                             ~~Aug 27 01~~     ~~May 21~~
PROSECUTOR: FINE CLARK DALE                                 GRAND JURY: 200103061

```
OTH CSE: DC200100005800 CHK/TICKET NO: 2000-2139           OPER: PHA
OURT REPORTER:                SID NO:    000000000
EF STATUS: BOND               DEMAND:
```

DATE        ACTIONS,  JUDGEMENTS,  AND NOTES

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|------|-------------------------------|
| 4-6-01 | Δ failed to Appear for Pre-trial- F+C. Trial remains set 4-9-01  EWR |
| 4-9-01 | Δ failed to appear for trial -F+C. State's Motion to Withdraw & File GRANTED. |
| 4-9-01 | Δ appeared before the Court. F+C set aside. Reset 4-12-01. EWR |
| 4-12-01 | Δ wants a trial- Trial set 5-21-01 EWR |
| 5-16-01 | Δ failed to Appear for Scheduling Confere F&C.  ⓣ reset 6-18-01. |

*over*

ACROJ69  ALABAMA  JUDICIAL  INFORMATION  CENTER

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2001 000194.00
JUDGE ID: EWP

STATE OF ALABAMA                    VS    ANDERSON CURTIS LAMARIO

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|------------------------------|
| 5-18-01 | Capias Issued |
| 5-21-01 | Capias Recalled - Δ appeared for trial.   Eugene W Reese |
| 5-22-01 | Warrant Recalled & Returned |
| 6-18-01 | Attorney to file M/Mental Eval - Reset 7-23 8-27-01.   EWP |
| 6-19-01 | Order dated 6-18-01 for Outpatient Mental Evaluation |
| 6/27/01 | Motion for Court-ordered mental eval examination of Defendant |
| 7-20-01 | Δ failed to appear for appointment for Outpatient Mental Examination. Bond revoked.  Δ ordered arrested   Eugene W Reese |
| 7-x-a | Capias Issued |
| 8-9-01 | Based upon Δ's having contacted clinical Psychologist & having made another appointment for 8-16-01, Capias Recalled - Bond re-instated   Eugene W Reese |
| 8-15-01 | Warrant Recalled   over |

8-27-01.  Defense counsel did not receive mental evaluation until late on 8-24-01. △'s Motion to continue Granted to allow △'s attorney to obtain school & mental records. Trial Reset 9-24-01.    EWR

8-27-01    Warrant Returned

9-25-01    Jury selection begins

9-25-01    Jury Trial begins

9-25-01    The Jury returned the following verdict: "We the Jury, find the Defendant Guilty of Robbery First Degree."

The Court determines the evidence warrants said verdict & the same is entered. Defendant adjudged Guilty of Robbery First Degree. Sentence set 10-18-01. PSI Ordered.    Eugene W Reese

4

| State of Alabama Unified Judicial System | **CASE ACTION SUMMARY** CONTINUATION | Case Number |
|---|---|---|
| Form C-7      Rev 2/79 | | CC-2001-359 |

Style:

Curtis Anderson                      Page Number _____ of _____ Pages

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 10-18-01 | Defendant with attorney Jim Porter appeared for sentencing. State's Motion to Invoke Habitual Felony Offender Act GRANTED with the Court finding that Defendant has 2 prior felony Convictions. State's Motion to Invoke Weapons Enhancement GRANTED. The Court, having considered the Presentence Investigation Report, and having asked the Defendant if he had anything to say prior to sentence, and the Defendant having his say, he is sentenced to the Department of Corrections for LIFE. Defendant ordered to pay Court costs, attorney's fees of $150, $50 to the Victims' Compensation Fund and restitution in the amount of $550. One-half of any monies to which Defendant may become entitled to be applied toward satisfaction of said amounts. Defendant advised of right to appeal.                          Eugene W Reese                 GENE REESE |
| 11/01/01 | Motion to withdraw as Counsel, Appoint Appellate Counsel and set appeal Bond. |
| 11/01/01 | Motion for Judgment of Acquittal or in the alternative for new trial or arrest of Judgement. |
| 11-1-01 | Notice of Appeal |
| 11-2-01 | Certificate of Appl to Crm Appls, Ag, DA, Attys (w/ form) + Crt reporter |
| 11-27-01 | Order appt'g atty on appl - appl bond denied |



| C-07 (Back) | CASE ACTION SUMMARY (Continuation) | Case Number |
|---|---|---|
| DATE | ACTIONS, JUDGMENTS, CASE NOTES | |
| 12-3-01 | Forms Filed | |

Case # 00-24338          **AFFIDAVIT**          2000f-2139

## DISTRICT COURT OF MONTGOMERY ALABAMA

INSTRUCTIONS: Complete the following information on OFFENSE/OFFENDER

Offense: ROBBERY 1ST DEGREE

Defendant's Name: B/M ANDERSON, CURTIS LAMARIO          D.O.B. 04/25/1965

Defendant's Address: 3858 HAPPINESS AVENUE, MONTGOMERY, ALABAMA

Date & Time of Offense: 10/26/2000 @ 1143 HOURS

Place of Occurance: 3871 S. COURT STREET, MONTGOMERY, ALABAMA 36110

Person or Property Attacked: WEIL'S CLOTHING

How Attacked: ROBBED AT GUNPOINT

Damage Done or Property Attacked: ASSORTED CLOTHING

Value of Property: $137.00

Details of Offense:
ON 10/26/00, AT APPROXIMATELY 1143 HOURS, B/M CURTIS LAMARIO ANDERSON,
ARMED WITH A HANDGUN, DID ENTER WEIL'S CLOTHING, 3871 S. COURT STREET,
AND ROBBED THE BUSINESS OF ASSORTED CLOTHING.

THE DEFENDANT WAS POSITIVELY IDENTIFIED, OUT OF PHOTOGRAPHIC LINE-UP
BY WITNESS B/F BETTY JACKSON.

THIS OFFENSE DID OCCUR WITHIN THE CITY OF MONTGOMERY, COUNTY OF
MONTGOMERY, STATE OF ALABAMA.

I make this affidavit for the purpose of securing a warrant against the said
B/M ANDERSON, CURTIS LAMARIO          . I understand that I am instituting a
criminal proceeding and cannot drop this case. I further understand that if any of the forgoing
facts are untrue, I may, in addition to any other punishment provided by law, be taxed with
court costs in this proceeding.

Sworn to and subscribed before me
this  22nd  day of November 2000____ .          _____
                                                            Complainant

_____
Judge - Clerk - Magistrate

WITNESSES: (Name, Address, Telephone Number)

1) ELIZABETH IRVINE, 1219 KINGSTON GREEN DR., PRATTVILLE, AL. 361-8240
2) BETTY JACKSON, 304 W. DELANO AVENUE, MONTGOMERY, AL. 334-265-1163
3) DET. M. K. HAMEED, #213,      MPD,      241-2831

ACR364

ALABAMA JUDICIAL DATA CENTER
DISTRICT COURT OF MONTGOMERY COUNTY
TRANSCRIPT TO CIRCUIT COURT

CASE: DC 2001 000052.00
JID: CRAIG MILLER

THE STATE OF ALABAMA        VS    ANDERSON CURTIS LAMARIO
3858 HAPPINESS AVE

MONTGOMERY        AL 36105-0000

CHARGE: ROBBERY 1ST

PROSECUTOR:                              DEF ATTY:
                                        DEF ATTY:

_____ WARRANT ISSUED AND DELIVERED TO SHERIFF.

12/24/2000 WARRANT EXECUTED BY ARRESTING THE DEFENDANT AND COMMITTING HIM
          TO JAIL (OR RELEASING HIM ON BOND).

01/05/2001  BOND    $30,000.00 APPROVED AND FILED.  SURETIES.

_____ DEFENDANT TRIED, CONVICTED AND FINED          0.00 DOLLARS
          AND THE COST OF THE PROSECUTION.

_____ ON PRELIMINARY EXAMINATION, DEFENDANT BOUND OVER TO AWAIT THE
          ACTION OF THE GRAND JURY AND BOND FIXED AT        $0.00.

_____ DEFENDANT APPEALED TO THE PRESENT TERM OF THE CIRCUIT COURT AND
          BOND FIXED AT $ _____."

_____ BOND APPROVED AND FILED; SURETIES:
                    SOO1  ANDERSON JOHN L.

02/23/2001 NO PRELIMINARY REQUESTED, CASE TRANSFERRED TO D. A.
          CASE LAPSE FWD

BILL OF COST

        DOCKET FEE              0.00

        PRELIMINARY HEARING     0.00

        WITNESS SUBPOENA        0.00

            TOTAL               0.00

CERTIFICATE TO TRANSCRIPT

TO THE CLERK AND THE CIRCUIT COURT:
  I HEREBY CERTIFY THAT THE FOREGOING IS A FULL, COMPLETE AND EXACT
TRANSCRIPT FROM MY DOCKET OF THE JUDGMENT AND PROCEEDINGS IN THE ABOVE
CLAUSE, AND I HEREWITH SEND TO THE CIRCUIT COURT ALL THE ORIGINAL AND
OTHER PAPERS PERTAINING TO THE SAID CAUSE.

DATE ISSUED: 02/26/2001   MELISSA RITTENOUR       BY _____
                          CLERK

NOTE:

WITNESS FOR STATE:

OPERATOR: BIM
PREPARED: 02/26/2001

01-359

0527

GJ NO. _____

THE STATE OF ALABAMA

Curtis L. Anderson
B/M HT:5'7 WT:160 DOB:04/25/65

3858 Happiness Avenue

SID. NO. ___00941357___    ARREST DATE ___12/24/00___

FOR

Robbery I

*Willie F. Muse*

Foreperson of Grand Jury

A TRUE BILL.

No Prosecutor

BAIL IN THIS CASE IS FIXED AT

$ 30,000

*Shelly Watkins*

Judge of Circuit Court of Montgomery County

CC NO. _____

EWR

Focia
MSO
ENC

---

Presented in open Court by the Foreperson of
the Montgomery County Grand Jury in the pres-
ence of ___17___ other members of
the Grand Jury and filed this ___9___
day of ___March___, 200_9_

*Melvin Williams*

Clerk of the Circuit Court of Montgomery County

**WITNESSES**

1 Pamela Boyd
24 W. Delano

2 J.S. Grier
Wk:MPD

3 M.K. Hameed
Wk:MPD

4 Elizabeth Irvine
1219 Kingston Green

5 Betty Jackson
304 W.Delano Avenue
Wk:Weil's Clothing 3871 S. Court St

6 Paketia Mays
3817 Rosa Park Ave
Wk:Weil's Clothing 3871 S. Court St

7 S.L. Rucker
Wk:MPD

8 Eugene Smith
Wk:Weil's Clothing 3871 S. Court St.

9 S.E. Wilson
Wk:MPD

# THE STATE OF ALABAMA

## MONTGOMERY COUNTY

Circuit Court of Montgomery County. _____ MARCH _____Term, A.D. 2001

The Grand Jury of said County charge that, before the finding of this indictment,

CURTIS L. ANDERSON, alias
CURTIS LAMARIO ANDERSON,

whose name is otherwise unknown to the Grand Jury, did, in the course of
committing a theft of clothing, of some value, a better description of
which is unknown to the Grand Jury, use force against the person of the
owner or any person present, Betty Jackson and/or Eugene Smith, with intent
to overcome their physical resistance or physical power of resistance, or
threaten the imminent use of force against the person of the owner or any
person present, Betty Jackson and/or Eguene Smith with intent to compel
acquiescence to the taking of or escaping with the property, while the said
Curtis L. Anderson, alias was armed with a deadly weapon or dangerous
instrument, a gun, a better description of which is unknown to the Grand
Jury, in violation of Section 13A-8-41 of the Code of Alabama,

against the peace and dignity of the State of Alabama.

_Eleanor P. Brooks_
District Attorney, Fifteenth Judicial Circuit of Alabama

| STATE OF ALABAMA<br>UJS FORM C-10A 11/89 | AFFIDAVIT OF INDIGENCY<br>AND ORDER | CASE NUMBER<br>CC 2001 359-6UN<br>ID    YR    NUMBER |
|---|---|---|

In the _____ Court of Montgomery County.
State of Alabama vs. _Anderson, L Curtis_
In the matter of : Address: _3858 Happiness Ave_
Charge/Type Proceeding: _Robery I_    Phone: _(334) 262-3167_

| | 1. | Do you have an appointed attorney on any other pending criminal case?<br>No ✓    Yes _____    Attorney's Name _____ |
|---|---|---|

**EMPLOYMENT/INCOME**

A. Do you have a job or work for yourself?    Yes _____    No ✓
   Employer Name and Address _Inter Decora_
   How much do you earn each week?    Gross $ _____    Take Home $ _____

B. Does your husband or wife work?    _____ Yes    ✓ No
   Employer Name and Address _____
   How much do you receive each month?    Gross $ _____    Take Home $ _____

C. Do you or your wife receive benefits from any other source?    _____ Yes    ✓ No
   How much do you receive each month?    $ _____

**DEFENDANT**

A. Do you have any money in any bank, savings and loan, credit union, or any other place including cash on hand?
   _____ Yes    ✓ No    Where? _____    How much? $ _____

B. Do you own anything else of value? (Land, House, Car, Etc.)    _____ Yes    ✓ No
   What? _____    Total Value $ _____

**ASSETS**

A. Are you    _____ Single    _____ Married    _____ Widowed    ✓ Divorced/Separated

B. Do you have any dependents?    ✓ Yes    _____ No
   Who and what relationship? _1 Daughter_    _Live With Family_

**DEBTS**

A. What does it cost you to live each month?    $ _____

| Creditor | Total Debt | Monthly Payment | Creditor | Total Debt | Monthly Payment |
|---|---|---|---|---|---|
| Loans | $ _____ | $ _____ | Car Payment | $ _____ | $ _____ |
| Charge Accounts | $ _____ | $ _____ | Groceries | $ _____ | $ _____ |
| House or Rent Payment | $ _____ | $ _____ | Utilities | $ _____ | $ _____ |
| Alimony | $ _____ | $ _____ | | $ _____ | $ _____ |
| Support | $ _____ | $ _____ | | $ _____ | $ _____ |

It is may desire at this time to have counsel appointed by the court to represent me on the above charge(s). In support of this request, I have answered the preceding questions relating to ability to pay. I swear or affirm that the answers are true and reflect my present financial status. I understand that a false statement or answer to any questions in this affidavit may subject me to penalties for perjury. I authorize, if necessary, the court or its authorized representative to attain records or information pertaining to my financial status from any source. I further understand and acknowledge that if the court appoints an attorney to represent me, the court may require me to pay the fees and expenses of my court appointed counsel.

Sworn to and subscribed before me this _22nd_

day of _3_ , 20 _01_    _____
                                        Affiant/Defendant
_Linda Rhodes_
         Judge/Notary

RECEIVED
3-27-01
CIRCUIT COURT CLERK

**ORDER**

It is ordered that the foregoing request be:    ✓ Granted    ☐ Denied

**APPOINTMENT OF ATTORNEY**

It is therefore ordered and adjudged by the Court that _James Porter_ Attorney at Law, be and is hereby appointed as counsel to represent, assist and defend in this (these) case(s). It is further ordered that the Court reserves the right and may order reimbursement of Attorney's fees and expenses, approve by the Court and paid to the appointed counsel.

Done this _26_ day of _March_ 20 _01_    _____
                                                                 Judge

WHITE—FILE    GREEN—ATTORNEY    PINK—DEFENDANT

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,          )
    Plaintiff,          )
                )
v.                        )     CC No. 01- 0359  - EWR
                )
__Curtis L Anderson__ ,    )
    Defendant.          )

APR 2001
FILED
Melissa Rittenour
Circuit Clerk

### NOTICE OF
### DISCOVERY TO DEFENDANT,
### INTENT TO USE PRIOR CONVICTIONS,
### INTENT TO INVOKE SENTENCING ENHANCEMENTS,
### INTENT TO OFFER PROOF BY A CERTIFICATE OF ANALYSIS, and
### MOTION FOR DISCOVERY BY THE STATE

    COMES NOW the State of Alabama, by and through its District Attorney for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and gives notice as to the following:

( ✓ )1.  Pursuant to Rule 16.1, A.R.Cr.P., and as otherwise required by law, all available discovery has been provided or made available to the Defendant's counsel of record.  Physical evidence, if any, is in the custody of the investigating law enforcement agency or the Alabama Department of Forensic Sciences.  Arrangements to inspect physical evidence may be made by contacting the undersigned.
    The State has, with this notice, furnished a copy of the complete "case file" (less work product) to Defense Counsel.  This material is page numbered sequentially from 000001 to _82 : 84 · 85_ .
The State will consider this discovery material to have been received in its entirety by Defense Counsel unless the State is notified in writing of any discrepancies.

( ✓ )2.  The State intends to use at trial any and all prior convictions, crimes, wrongs, or acts of the Defendant for those uses permitted by Rules 404(b) and 609 of the A.R.E., and as otherwise allowed by law.  The State is presently aware of, and intends to use, the following:

TOP II Montgomery 1985        TOP III Montgomery 1998

Burglary III Montgomery 1985   _____

Robbery III Montgomery 1985    _____

Robbery III Montgomery 1985    _____

Assault III Montgomery 1987    _____

( ✓ ) 3.   The State intends to invoke all sentencing enhancements required or permitted by law, including the Habitual Felony Offender Act based on any applicable felony convictions, known and or any convictions which may subsequently be disclosed, and if applicable, the following:

      ( ✓ ) Enhancement for use of firearm of deadly weapon.
      Minimum term of imprisonment of _20_ years.

( ____ ) 4.   Pursuant to Sections 12-21-300 through 303, Code of Alabama, written notice is hereby given of the State's intent to offer proof by a certificate of analysis in lieu of direct testimony.  The certificate of analysis is from the Alabama Department of Forensic Sciences and is included in the provided discovery material.

( ✓ ) 5.   Pursuant to Rules 16.2 and 16.4(c), A.R.Cr.P., and as otherwise required by law, the State requests a copy of all discovery to which it is entitled and hereby moves this Honorable Court for an order granting same to the State.

Respectfully submitted this _4_ day of _April_ 2001.

                ELEANOR I. BROOKS
                District Attorney

          By: _Daryl D. Bailey_
                Daryl D. Bailey
                Deputy District Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was served upon the Honorable _Jim Porter_ by hand delivery or by placing a copy in the United States mail, postage prepaid and properly addressed this _4_ day of _April_ 2001.

                ELEANOR I. BROOKS
                District Attorney

          By: _Daryl D. Bailey_
                Daryl D. Bailey
                Deputy District Attorney

*13*

FIFTEENTH JUDICIAL CIRCUIT

CC-2001-359-EWR

| | | |
|---|---|---|
| STATE OF ALABAMA, | * | |
| | * | |
| Plaintiff | * | ORDER FOR OUTPATIENT |
| | * | |
| | * | |
| VS. | * | MENTAL EVALUATION |
| | * | |
| | * | |
| CURTIS LAMARIO ANDERSON, | * | |
| | * | |
| Defendant | * | |

WHEREAS, the defendant is before the Court having been charged with the offense(s) of ROBBERY, I; and,

WHEREAS, the Court has received information indicating that the above-named defendant may lack sufficient present ability to assist in his/her defense by consulting with counsel with a reasonable degree of rational understanding of the facts and the legal proceedings (motion for examination having been filed by attorney for defendant), and the Court finding reasonable grounds exist to question defendant's competency; and the defendant, through his/her attorney, has timely filed a notice pursuant to Rule 15, *Alabama Rules of Criminal Procedure*, of his/her intent to pursue a special plea of not guilty by reason of mental disease or defect or not guilty and not guilty by reason of mental disease or defect,

It is hereby ORDERED that:

(1)    The defendant shall undergo an examination by a Certified Forensic Examiner appointed by the Department of Mental Health and Mental Retardation and certified to

RECEIVED

6-19-01

conduct clinical evaluations of competency to understand and participate in these proceedings and mental state at the time of the offense(s);

(2)    The examination shall occur on an outpatient basis by one of the Certified Forensic Examiners associated with and/or in the offices of CLINICAL PSYCHOLOGISTS, PC, 1520 MULBERRY STREET, MONTGOMERY, ALABAMA or if defendant is in custody, the person who has custody of the defendant shall make defendant available at such times and locations as required by the ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION, and where necessary, the transportation of the defendant during the outpatient visit;

(3)    The District Attorney and arresting law enforcement agency shall make available to the examining clinician information concerning the nature and circumstances of the offense(s) charged, as well as prior criminal history of the defendant; the Defense Attorney shall provide such information as deemed appropriate to assist the examiner in the evaluation of the defendant's mental condition, including records of prior psychiatric treatment. All information provided to the clinician pursuant to this ORDER shall be protected from discovery according to Rule 16 of the *Alabama Rules of Criminal Procedure.*

(4)    Upon completion of the clinical examination, copies of the written report shall be forwarded to the undersigned Circuit Judge, defendant's Attorney, District Attorney, and upon further Order of the Court, to others having a proper interest therein. The original report shall be filed with the Clerk of Court, under seal, and shall contain the following information:

(a)    The mental condition of the defendant as related to his/her sufficient present ability to assist in his/her defense, by consulting with counsel, with a reasonable degree

of rational understanding the facts and the legal proceedings against the defendant.

(b)    If it is the opinion of the examiner that the defendant lacks sufficient present ability to assist in his/her defense, by consulting with counsel, with a reasonable degree of rational understanding of the facts and legal proceedings against the defendant, the report shall also state the opinion of the examiner as to:

(1)    The condition causing such the defendant's incompetency and the nature thereof;

(2)    The treatment required by the defendant to attain competency;

(3)    The most appropriate type and place of treatment in view of the defendant's therapeutic needs and potential danger to self or others and an explanation of appropriate treatment alternatives;

(4)    The likelihood of the defendant's attaining competency under treatment    and the probable duration of the treatment; and

(5)    The availability of the various types of acceptable treatment in the local geographic area, specifying the agencies of settings in which the treatment might be obtained and whether the treatment would be available on an outpatient basis;

(6)    The written report shall further address:

(a)    The mental condition of the defendant at the time of the alleged offense(s);

(b)    If the examiner's opinion is that at the time of the alleged offense(s), the defendant suffered from mental disease or defect, the relation, if any of such mental disease or defect to the alleged offense(s);

(c)    If, in the opinion of the examiner, defendant was capable

of understanding and waiving his Miranda Rights, and if not, the reason for his inability.

(5)     In addition to such written report, the Court shall be given a verbal report should the examiner believe the defendant to be in need of immediate psychiatric treatment so that further action can be taken as deemed appropriate.

(6)     Further criminal proceedings against the defendant are continued generally until the Court receives a report from the ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION, provided, however, such continuation does not include bond hearing, grand jury hearings or preliminary hearings, all of which may be conducted as necessary.

DONE and ORDERED this the 18th day of June, 2001.

_____
EUGENE W. REESE
CIRCUIT COURT JUDGE


Clinical Psychologists, PC
1520 Mulberry Street
Montgomery, Alabama - 36104
Deputy District Attorney
Attention: Stacey Brown
Jim Porter, Attorney for Defendant





# Kirkland, King & Renfro
Clinical Psychologists, P.C.

1520 Mulberry Street
Montgomery, Alabama 36106-1520
(334) 269-1106
Fax (334) 832-9557

<u>Licensed Psychologists</u>
Karl Kirkland, Ph.D.
Glen D. King, J.D., Ph.D., ABPP
Guy J. Renfro, Ph.D.

August 1, 2001

Curtis L. Anderson
3858 Happiness Street
Montgomery, Alabama 36105-2518

Dear Mr. Anderson:

This letter is to confirm that you contacted our office by telephone Wednesday, August 01, 2001 to schedule an appointment for the assessment which was ordered by the Honorable Eugene Reese.

Your appointment is scheduled for **Thursday, August 16, 2001 at 10:00 a.m.**. Please be sure to keep this scheduled appointment. You need to plan on being at our office for approximately one and a half to two hours.

Sincerely,

J.L. McGough
Office Manager

Jlm

Cc: Hon. Eugene Reese
    Mary Bloodsworth, Court Administration
    District Attorney
    Jim Porter, Attorney at Law

RECEIVED
8-13-01
CIRCUIT COURT CLERK



# Kirkland, King & Renfro
## Clinical Psychologists, P.C.

1520 Mulberry Street
Montgomery, Alabama 36106-1520
(334) 269-1106
Fax (334) 832-9557

<u>Licensed Psychologists</u>
Karl Kirkland, Ph.D.
Glen D. King, J.D., Ph.D., ABPP
Guy J. Renfro, Ph.D.

July 30, 2001

Curtis L. Anderson
3858 Happiness Street
Montgomery, Alabama 36105-2518

Dear Mr. Anderson:

The Honorable Eugene Reese, Circuit Court Judge of Montgomery County, ordered that I conduct a psychological evaluation on you. An appointment was scheduled on Tuesday, July 17, 2001 at my office at 1520 Mulberry Street in Montgomery. However, you did not come for this appointment. I have notified the court of your failure to appear for this evaluation.

I am asking that you contact my office at 269-1106 to schedule a time and date convenient for you when this evaluation can be completed. I look forward to hearing from you in the near future.

Very sincerely,

Guy J. Renfro, Ph.D.
Licensed Psychologist
Certified Forensic Examiner

CC:    Jim Porter
       Mary Bloodsworth
       Judge Reese
       DA's office

CURTIS D. JACKSON
X001-32

TERM DATE: 09/24/2001   PANEL: ALL   STATUS: A

| STRIKE | JUROR# | JUROR'S NAME/COMMENTS | BIRTH DATE | SEX | RAC | PNL | STATUS |
|--------|--------|------------------------|-----------|-----|-----|-----|--------|
| (16) 0331 | 098586 | RICE KIMBERLY M | 11/19/1960 | F | B | 01 | ACTIVE |
|  |  | ▮▮▮▮▮▮▮▮▮▮ J | 06/21/1957 | F | W | 01 | ACTIVE |
|  |  | ▮▮▮▮▮▮▮▮▮▮ | 01/08/1942 | M | B | 01 | ACTIVE |
| 0345 | 084725 | ROSSON ROGER L | 01/07/1940 | M | W | 01 | ACTIVE |
| 0347 | 040210 | SANDERS DESI D | 04/13/1978 | M | B | 01 | ACTIVE |
| 0353 | 097810 | SCANN PETER F | 04/09/1963 | M | W | 01 | ACTIVE |
| 0354 | 080104 | SELLERS ELOISE K | 11/07/1931 | F | W | 01 | ACTIVE |
| (17) 0357 | 033893 | SHADBURN WILLIAM B | 09/03/1940 | M | W | 01 | ACTIVE |
|  |  | ▮▮▮▮▮▮▮▮▮▮ | 04/06/1973 | F | W | 01 | ACTIVE |
|  |  | ▮▮▮▮▮▮▮▮▮▮ | 11/26/1974 | M | W | 01 | ACTIVE |
| 0370 | 068501 | SMITH JOHN M | 05/06/1943 | M | C | 01 | ACTIVE |
| 0372 | 036??? | SMITH-HOON MATTIE L | 08/13/1951 | F | B | 01 | ACTIVE |
|  |  | ▮▮▮▮▮▮▮▮▮▮ | 07/29/1961 | F | B | 01 | ACTIVE |
| 0380 | 068702 | SPIVEY CHRISTOPHER K | 03/26/1966 | M | W | 01 | ACTIVE |
| (18) |  | ▮▮▮▮▮▮▮▮▮▮ | 09/28/1970 | F | W | 01 | ACTIVE |
| 0389 | 073938 | TARVER -BROWN JENNIFER | 05/26/1969 | F | B | 01 | ACTIVE |
| 0393 | 054344 | TAYLOR TRAVIS A ExC Tues | 11/24/1976 | M | W | 01 | ACTIVE |
|  |  | ▮▮▮▮▮▮▮▮▮▮ | 07/03/1947 | M | W | 01 | ACTIVE |
| 0400 | 050991 | THORNTON GILDA L | 02/04/1952 | F | B | 01 | ACTIVE |
| 0406 | 003852 | UTLEY JOYCE H | 09/20/1950 | F | W | 01 | ACTIVE |
| 0408 | 056225 | VICE JAMES E | 08/15/1935 | M | W | 01 | ACTIVE |
| (19) 0409 | 092572 | VINSON JERRY L | 08/28/1953 | M | B | 01 | ACTIVE |
| 0415 | 037710 | WARE THOMAS H | 04/10/1963 | M | W | 01 | ACTIVE |
| 0416 | 085126 | WATKINS VENESSA F | 07/07/1960 | F | B | 01 | ACTIVE |
| 0418 | 021569 | WATSON TEDDY A | 07/31/1945 | M | W | 01 | ACTIVE |
| 0419 | 043133 | WATTS VERNELL C | 03/13/1943 | F | B | 01 | ACTIVE |
| 0422 | 053145 | WEST MAURY A | 04/04/1953 | M | W | 01 | ACTIVE |
| 0424 | 014796 | WHITAKER NORMAN J | 04/21/1969 | M | W | 01 | ACTIVE |
| (20) 0427 | 057921 | WHITEHEAD GARETH D | 03/15/1951 | M | W | 01 | ACTIVE |
| 0428 | 100890 | WHITEHURST MARGARET M | 07/29/1926 | F | W | 01 | ACTIVE |
| 0431 | 026962 | WILLIAMS ANNA S | 10/12/1950 | F | B | 01 | ACTIVE |
| 0432 | 070087 | WILLIAMS CALVIN | 01/06/1957 | M | B | 01 | ACTIVE |
| 0435 | 090948 | WILLIAMS DEBORAH B | 06/18/1952 | F | C | 01 | ACTIVE |
| 0436 | 102175 | WILLIAMS PATRICIA | 11/19/1976 | M | C | 01 | ACTIVE |
| 0437 | 015566 | WILLIAMS RHONDA W | 05/31/1963 | F | B | 01 | ACTIVE |

5     9 J26-01

TERM DATE: 09/24/2001    PANEL: ALL    STATUS: A
--------------------------------------------------------------------
STRIKE JUROR# JUROR'S NAME/COMMENTS        BIRTH DATE SEX RAC PNL STATUS
--------------------------------------------------------------------
0438  038513 WILLIAMS RODNEY G            06/03/1955  M   W   01  ACTIVE
--------------------------------------------------------------------
0442  028658 WINDHAM BETTY H             03/22/1950  F   W   01  ACTIVE
--------------------------------------------------------------------
0444  018492 WOODS MARY B                12/11/1934  F   B   01  ACTIVE
--------------------------------------------------------------------
0450  079482 ZEIGLER VERDELL M           05/27/1955  F   B   01  ACTIVE
--------------------------------------------------------------------
0501  107400 POWELL WILLIAM E            03/29/1944  M   C   00  ACTIVE
--------------------------------------------------------------------


* * *   P R O G R A M   T O T A L S * * *


RECORDS WRITTEN:   145

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT
MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA            )
                            )
        v.                  )        CC 01-359 EWR
                            )
CURTIS ANDERSON             )

<u>STATE'S REQUESTED JURY INSTRUCTIONS</u>

Comes now the State of Alabama and hereby requests that this

Honorable Court give the attached jury instructions to the jury.

Respectfully submitted this the 27th day of August, 2001.

> Eleanor I. Brooks
> District Attorney
>
> By: _____
> Daryl D. Bailey
> Deputy District Attorney

<u>CERTIFICATION</u>

I hereby certify that a copy of the foregoing was served upon the

Honorable Jim Porter, attorney for the defendant, by hand delivery this

the 27th day of August, 2001.

> _____
> Daryl D. Bailey
> Deputy District Attorney

9-26-01

State's requested charge # _____

In Robbery in the first degree case, robbery victim does not actually have to see a weapon to establish the element of force; reasonable belief that the robber is armed is sufficient ... Rice v. State 620 So. 2d 140 (Ala. Crim. App. 1993).

State's requested charge # _____

To be convicted of first degree robbery an accused need not be armed with a deadly weapon or dangerous instrument where he possesses any object reasonably believed to be a deadly weapon or dangerous instrument or represents in some manner that he has one...<u>Stewart v. State</u> 443 So. 2d 1362 (Ala. Crim. App. 1983).

State's requested charge # _____

The victim does not have to see a weapon; his belief that the robber is armed is sufficient...<u>Dinkins v. State</u>  584 So. 2d 932 (Ala. Crim. App. 1985).

State's requested charge # _____

It is not necessary to prove that the defendant displayed a weapon during a robbery or that he actually had a weapon to sustain a conviction of robbery in the first degree; in order to sustain a conviction for first degree robbery, the accused need only represent in some manner that he has a deadly weapon or instrumentality; thus, the test to be applied is a subjective one which focuses on the victim's reaction to the threat of the robber <u>Bennett v. State</u>, 482 So. 2d 1277 (Ala. Crim. App. 1985).

26

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

State of Alabama,
    Plaintiff,

v.                                    Case No:CC-2001-0359

Curtis Lamario Anderson,
    Defendant.


## JURY VERDICT


⎯╳⎯⎯    We the jury find the Defendant **Guilty** of the offense of Robbery I.

⎯⎯⎯⎯    We the jury find the Defendant **Guilty** of the offense of Robbery III.

⎯⎯⎯⎯    We the jury find the Defendant **Guilty** of the offense of Theft III.

⎯⎯⎯⎯    We the jury find the Defendant **Not Guilty** of the offense of


_____
Foreperson

9-25-01
Date


9-26-01

ACJIC350

ALABAMA JUDICIAL DATA CENTER
MONTGOMERY COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT

CC 2001 000350 00
EUGENE W. REESE

CIRCUIT COURT OF MONTGOMERY COUNTY                    COURT ORI: 03000

STATE OF ALABAMA         VS.                DC NO: DC 2001 000350 00
ANDERSON CURTIS LAMARIO      ALIAS:         G J: 200103052
3058 HAPPINESS AVE           ALIAS:         SSN: 417085797
MONTGOMERY  AL  36105                       SID: 000000000
                                            AIS:

DOB: 04/25/1985  SEX: M  HT: 5 07   WT: 160  HAIR: BLK  EYE: BRO
RACE: ( )W (X)B ( )O  COMPLEXION: _____  AGE: ____  FEATURES: _____

DATE OFFENSE: 10/28/2000  ARREST DATE: 12/24/2000  ARREST ORI: 0030100

CHARGES @ CONV    CITES          CF CL COURT ACTION           CA DATE
ROBBERY 1ST       13A-008-041    01 A  CONVICTED              09/25/2001
                                 00                           00/00/0000
                                 00                           00/00/0000

JUDGE: EUGENE W. REESE                 PROSECUTOR: FINE CLARK DALE

PROBATION APPLIED   GRANTED  DATE     REARRESTED DATE   REVOKED  DATE
( )Y( )N           ( )Y( )N _____    ( )Y( )N _____   ( )Y( )N _____

15-18-8, CODE OF ALA 1975   IMPOSED    SUSPENDED   TOTAL      JAIL CREDIT
( )Y (X)N  CONFINEMENT:   00 00 000  00 00 000  00 00 000   00 00 013
           PROBATION  :   00 00 000             00 00 000
DATE SENTENCED: 10/18/2001    SENTENCE BEGINS: 10/18/2001

PROVISIONS               COSTS/RESTITUTION        DUE        ORDERED

  PENITENTIARY           RESTITUTION          $550.00      $550.00
  LIFE                   ATTORNEY FEE         $150.00      $150.00
  HABITUAL OFDR          CRIME VICTIMS         $50.00       $50.00
                         COST                 $727.00      $727.00
                         FINE                   $0.00        $0.00
                         MUNICIPAL FEES         $0.00        $0.00
                         DRUG FEES              $0.00        $0.00
                         ADDTL DEFENDANT        $0.00        $0.00
                         DA FEES                $0.00        $0.00
                         COLLECTION ACCT        $0.00        $0.00
                         JAIL FEES              $0.00        $0.00

                         TOTAL              $1477.00      $1477.00

APPEAL DATE      SUSPENDED        AFFIRMED         REARREST

( )Y( )N ___    ( )Y( )N ____    ( )Y( )N ____    ( )Y( )N ____

REMARKS:                         THIS IS TO CERTIFY THAT THE
                                 ABOVE INFORMATION WAS EXTRACTED
                                 FROM OFFICIAL COURT RECORDS
                                 AND IS TRUE AND CORRECT.

SENTENCED TO LIFE IN THE PENITENTIARY.
WEAPONS ENHANCEMENTS APPLIED IN THIS CASE.
50% OF MONIES TO COURT.


                                 MELISSA RITTENCURT(CC)

                                 10/29/2001

OPERATOR: DBH
PREPARED: 10/29/2001

# IN THE CIRCUIT COURT
## OF MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,                          )
                                           )
    Plaintiff,                         )
                                           )
v.                                         )    CASE NUMBER:  CC-2001-0359-EWR
                                           )
CURTIS LAMARIO ANDERSON,                   )
                                           )
    Defendant.                         )

## NOTICE OF APPEAL

COMES NOW James H. Porter, III, attorney of record for the above-named defendant, and hereby gives notice of the defendant's desire to appeal his conviction and sentence in the above-styled matter. The defendant was convicted of Robbery I on the 25th day of September, 2001 and was sentenced on the 18th day of October, 2001.

Respectfully submitted this the 1st day of November, 2001.


_____
James H. Porter, III
Attorney for Defendant

OF COUNSEL:

Porter and Porter
400 South Union Street
Suite 320
Montgomery, Alabama  36104
(334) 264-6000

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Deputy District Attorney, by placing a copy same in the District Attorney's Box at the Montgomery County Courthouse on this the 1st day of November, 2001.

_____
James H. Porter, III

# IN THE CIRCUIT COURT
## OF MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,                     )
                                      )
    Plaintiff,                        )
                                      )
v.                                    )  CASE NO.:  CC-2001-0359-EWR
                                      )
CURTIS LAMARIO ANDERSON,              )
                                      )
    Defendant.                        )

## MOTION TO WITHDRAW AS COUNSEL, APPOINT APPELLATE COUNSEL AND SET APPEAL BOND

COMES NOW James H. Porter, III, Attorney for Defendant Curtis Lamario Anderson, and respectfully requests that this Honorable Court will grant this, his Motion to Withdraw as Counsel on the above-styled case. The above-named Defendant was found guilty to Robbery in the first degree by jury verdict on the 25th day of September, 2001 and was sentenced by this Court on the 18th day of October, 2001. The Defendant further respectfully requests that a reasonable appeal bond would be set and that new counsel be appointed to handle the appeal.

Respectfully submitted this the 1st day of November, 2001.

James H. Porter, III
Attorney for Defendant

OF COUNSEL:

Porter and Porter
400 South Union Street
Suite 320
Montgomery, Alabama  36104
(334) 264-6000

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Deputy District Attorney, by placing a copy of same in the District Attorney's Box at the Montgomery County Courthouse on this the 1st day of November, 2001.

_____
James H. Porter, III

ACR371       ALABAMA JUDICIAL DATA CENTER
        NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
                    BY THE TRIAL COURT CLERK
            IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
STATE OF ALABAMA VS ANDERSON CURTIS LAMARIO    JUDGE: EUGENE W. REESE

APPEAL DATE: 11/01/2001

INDIGENCY STATUS:
    GRANTED INDIGENCY STATUS AT TRIAL COURT:         X   YES        NO
    APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:       YES    X   NO
    INDIGENT STATUS REVOKED ON APPEAL:                   YES    X   NO
    INDIGENT STATUS GRANTED ON APPEAL:               X   YES        NO

DEATH PENALTY: NO

APPEAL TYPE: STATE CONVICTION

THIS IS AN APPEAL FROM A CONVICTION.

DATE OF CONVICTION: 08/25/2001          DATE OF SENTENCE: 10/18/2001

YOUTHFUL OFFENDER STATUS: DENIED

CC/CASE NUMBER: 03/CC 2001 000359.00
CODE: ROB1   CONVICTION: ROBBERY 1ST          ACTION: CONVICTED
                                              STATUTE: 13A-008-041
SENTENCE:   CONF: 00 YRS 00 MOS 000 DAYS
SENTENCE:   PROB: 00 YRS 00 MOS 000 DAYS       LIFE: YES  LIFEWO: NO

POST-JUDGMENT MOTIONS FILED:    DT FILED      DT DENIED    CON BY AGREE
  X  MOTION FOR NEW TRIAL    11/01/2001
     MOTION FOR JUDG. OF ACQUIT
     MOTION TO W/D GUILTY PLEA
  X  MOTION FOR ATTY TO W/DRAW 11/01/2001
     OTHER

COURT REPORTER(S):              BONNETT, JACQUELINE F.
ADDRESS:                        C/O HON. EUGENE W. REESE
                                MONTGOMERY     , AL  36104

APPELLATE COUNSEL #1:           PORTER JAMES H III
ADDRESS:                        400 S. UNION ST SUITE 345
                                P. O. BOX 11477
PHONE NUMBER:                   MONTGOMERY     , AL  36104
                                334-264-6000

APPELLATE COUNSEL #2:
ADDRESS:

PHONE NUMBER:

APPELLANT (PRO SE):             ANDERSON CURTIS LAMARIO
ADDRESS:                        3858 HAPPINESS AVE
                                MONTGOMERY     , AL  361060000
AIS #:

APPELLEE (IF CITY APPEAL):
ADDRESS:

I CERTIFY THAT THE INFORMATION PROVIDED                  OPERATOR: PAA
ABOVE IS ACCURATE TO THE BEST OF MY              PREPARED: 11/02/2001
KNOWLEDGE AND I HAVE SERVED A COPY OF
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS  2  DAY OF  NOV , 2001      CIRCUIT COURT CLERK

33

## IN THE CIRCUIT COURT
## OF MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,                    )
                                     )
    Plaintiff,                   )
                                     )
v.                                   )   CASE NUMBER:  CC-2001-0359-EWR
                                     )
CURTIS LAMARIO ANDERSON,             )
                                     )
    Defendant.                   )

## MOTION FOR JUDGMENT OF ACQUITTAL OR IN THE ALTERNATIVE FOR NEW TRIAL OR ARREST OF JUDGMENT

COMES NOW James H. Porter, III, attorney for the above-named defendant, and respectfully moves this Honorable Court to enter a judgment of acquittal in the above-styled action in favor of the defendant, or in the alternative, defendant moves this Honorable Court to set aside the judgment entered on September 25, 2001 whereby defendant was convicted of Robbery I, and grant the defendant a new trial, or in the alternative, defendant moves this Honorable Court to arrest judgment on the following grounds:

The verdict is contrary to law and the verdict is contrary to the weight of the evidence presented.

Respectfully submitted this the 1st day of November, 2001.

James H. Porter, III

Porter and Porter
400 South Union Street  Suite 320
Montgomery, Alabama  36104

11/26/01
DENIED. EWR

RECEIVED
11-27-01

CC: D.H.
Jim Porter

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon the Deputy District Attorney, by placing a copy of same in the District Attorney's Box at the Montgomery County Courthouse on this the 1st day of November, 2001.

James H. Porter, III

# IN THE CIRCUIT COURT
## OF MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA,                    )
                                     )
    Plaintiff,                  )
                                     )
v.                                   )    CASE NO.:  CC-2001-0359-EWR
                                     )
CURTIS LAMARIO ANDERSON,             )
                                     )
    Defendant.                  )

## ORDER

The Court having found Defendant to be indigent, and Granting the Motion of James H. Porter, III to withdraw as counsel, it is ORDERED that **Maceo Kirkland** is appointed to represent Defendant on appeal in the above-referenced matter and an Appeal Bond is ~~set in the amount of~~ Denied.

DONE this the ___27___ day of _Nov_, 2001.

_____
CIRCUIT JUDGE

Copies:

Maceo Kirkland
Jim Porter
Deputy District Attorney

RECEIVED
11-27-01
CIRCUIT COURT CLERK

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 26 (front)   8/91 | COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT | Criminal Appeal Number<br><br>_____ . _____ |

**A. GENERAL INFORMATION:**

☑ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF  *Montgomery*  COUNTY

*Curtis Lamario Anderson* , Appellant

v.  ☑ STATE OF ALABAMA  ☐ MUNICIPALITY OF _____

| Case Number<br>*2001-0359* | Date of Complaint or Indictment<br>*3/9/01* | Date of Judgment/Sentence/Order<br>*~~10/17/01~~ 10/18/01* |
| Number of Days of Trial/Hearing<br>*One*   Days | Date of Notice of Appeal<br>Oral:                          Written: *11/1/01* | |

Indigent Status Requested:  ☑ Yes  ☐ No          Indigent Status Granted:  ☑ Yes  ☐ No

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☑ Appointed  ☐ Retained.    If no attorney, will appellant represent self?  ☐ Yes  ☐ No

Appellant's Attorney (Appellant if pro se) (Attach additional pages if necessary)    Telephone Number

*Maceo Kirkland KIR030*                  *(334) 261-6200*

Address *529 S. Perry St, STE, 14A*  City *Montgomery*  State *AL,*  Zip Code *36104*

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
| Codefendant | Case Number |
| Codefendant | Case Number |

*[Circular stamp: Melissa Rittenhour Circuit Clerk FILED DEC 2001]*

**D. TYPE OF APPEAL:** Please check the applicable block.

1 ☑ State Conviction        4 ☐ Pretrial Order           7 ☐ Juvenile Transfer Order      10 ☐ Other (Specify)
2 ☐ Post-Conviction Remedy  5 ☐ Contempt Adjudication    8 ☐ Juvenile Delinquency         _____
3 ☐ Probation Revocation    6 ☐ Municipal Conviction     9 ☐ Habeas Corpus Petition       _____

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____     6 ☐ Trafficking in Drugs - § _____     11 ☐ Fraudulent Practices - § _____
2 ☐ Homicide - § _____           7 ☐ Theft - § _____                  12 ☐ Offense Against Family - § _____
3 ☐ Assault - § _____            8 ☐ Damage or Intrusion                  13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful                   to Property - § _____           14 ☐ Traffic - Other - § _____
     Imprisonment - § _____       9 ☐ Escape - § _____                15 ☐ Miscellaneous (Specify):
5 ☐ Drug Possession - § _____    10 ☐ Weapons/Firearms - § _____          *Robbery I* - § *13A-8-41*

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes  ☑ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?  ☑ Yes  ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. *12/3/01*
                                                                                              (Date)
3. If the answer to question "1" is "No":
   (a) Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☐ No
   (b) Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes  ☐ No

NOTE: If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

37

Form ARAP- 26 (back)    8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| 11 | 1 | 01 | Motion For Judgement of Acquittal or New Trial | 11 | 26 | 01 |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

On 10/26/00, the appellant was arrested and charged with First degree robbery. He allegedly entered a retail clothing store and robbed the business at gunpoint of several items of clothing.

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

Unknown at this time

**K. SIGNATURE:**

12/3/01
Date

_Maceo Kirkland_
Signature of Attorney/ Party Filing this Form

| State of Alabama Unified Judicial System<br><br>Form ARAP-1C          8/91 | REPORTER'S TRANSCRIPT ORDER -- CRIMINAL<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br><br>CR - 01 - 079 |

**TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.**

☑ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF _Montgomery_ COUNTY

_Curtis Laronie Anderson_ , Appellant

v.    ☑ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number<br>CC - 01 - 0359 | Date of Judgment/Sentence/Order<br> ~~Entered~~ 10/18/01 |
| Date of Notice of Appeal<br>Oral:                    Written: 11/1/01 | Indigent Status Granted:<br>☑ Yes        ☐ No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY (1) THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR (2) THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*)

_____          _____          _____
Signature                                          Date                                        Print or Type Name

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

**MARK PROCEEDINGS REQUESTED:**                                                   COURT REPORTER(S)

A. ☑ **TRIAL PROCEEDINGS** - Although this designation will include the judgment and sentence      _Jackie Bennett_
proceedings, a transcript of the organization of the jury and argument of counsel must      _____
be designated separately      _____

B. ☐ **ORGANIZATION OF THE JURY** - This designation will include voir dire examination and      _____
challenges for cause. Note that in noncapital cases the voir dire of the jury will not be      _____
recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)      _____

C. ☑ **ARGUMENTS OF COUNSEL** - Note that in noncapital cases the arguments of counsel will      _____
not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)      _____

IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):

| ADDITIONAL PROCEEDINGS REQUESTED | DATE | COURT REPORTER(S) |
|---|---|---|
| D. _____ | _____ | _____ |
| E. _____ | _____ | _____ |
| F. _____ | _____ | _____ |
| G. _____ | _____ | _____ |

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER'S TRANSCRIPT:**

I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY (1) THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR (2) THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, (3) THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS

_Maceo Kirkland, Esq._          12/3/01          _Maceo Kirkland_
Signature                                          Date                                        Print or Type Name

**DISTRIBUTION:** Original filed with Clerk of Trial Court and copies mailed to: (1) Clerk of the Court of Criminal Appeals, (2) the District Attorney, (3) the Attorney General or the municipal prosecutor in lieu of the District Attorney and the Attorney General if the appeal is from a municipal conviction, and (4) to each Court Reporter who reported proceedings designated for inclusion in the reporter's transcript.

R-1

1       IN THE FIFTEENTH JUDICIAL CIRCUIT

2         IN AND FOR MONTGOMERY COUNTY

3              MONTGOMERY, ALABAMA

4

CURTIS LAMARIO ANDERSON )
5                         )
            Appellant,    )
6                         )
vs                        )    CASE NO.  CC-2001-359-R
7                         )
STATE OF ALABAMA,         )
8                         )
            Appellee.     )
9       _____

ii

EXHIBIT INDEX

STATE'S EXHIBITS:

        1 - Miranda Rights....................78
        2 - Tape of Statement.................80


DEFENDANT'S EXHIBITS:

        1 - Psychological Report.............85


                * * * * * *

**STATE'S EXHIBIT**
1

# City of Montgomery, Alabama
## Department of Police

CURTIS ANDERSON  12 GRADE ED.
### NAME

320 N. RIPLEY ST. MONTG.
### PLACE

12-24-00
### DATE

2045
### TIME

ROBBERY 1ST DEGREE
### CHARGE

Before asking you any questions, I must explain to you that you can remain silent. that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. If you cannot afford to hire a lawyer and want to have one present during interrogation, the Court will appoint one before we question you. If you want to answer questions now, you can do so, but you can stop at any time.

OFFICER

I fully understand the foregoing statement and do willingly agree to answer questions. I understand and know what I am doing. No promise or threats have been made to me by anyone and no pressure of any kind has been made against me by anyone.

WITNESSES:

23

### Kirkland, King & Renfro
Clinical Psychologists, P.C.

1520 Mulberry Street
Montgomery, Alabama 36106-1520
(334) 269-1106
Fax (334) 832-9557



**DEFENDANT'S EXHIBIT**

*I*

Licensed Psychologists
Karl Kirkland, Ph.D.
Glen D. King, J.D., Ph.D., ABPP
Guy J. Renfro, Ph.D.

**Name: Anderson, Curtis LaMario**
**Case No.: CC-01-0359**
**Date of Birth: 04/25/65**
**Date of Eval.: 08/16/01**

## FORENSIC EVALUATION REPORT

### DATE OF REPORT: 08/17/01

### REFERRAL INFORMATION

Curtis Anderson is a 36 year old single African American male who currently is charged with **Robbery I**. The Honorable Eugene Reese, Circuit Court Judge of Montgomery County ordered that Curtis Anderson undergo forensic psychological evaluation to provide the court with information regarding Mr. Anderson's mental state as it applies to his competency to stand trial, mental state at the time of offense, and competency to waive Miranda Rights. In an effort to comply with this order, Curtis Anderson was seen for psychological evaluation in the offices of Clinical Psychologists, P.C. of Montgomery, Alabama on August 16, 2001.

### NOTIFICATION

Prior to the initiation of the evaluation, Curtis Anderson was explained the nature and purpose of the evaluation to take place. Mr. Anderson wanted his mother present during this part of the evaluation, so the examiner did ask Dorothy Anderson to come back as the purpose of the evaluation was explained to Mr. Anderson. Both Mr. Anderson and his mother were informed that the information provided would be compiled in a report that would be submitted to the court, to his attorney, and to the prosecutor. Mr. Anderson was explained the circumstances under which the information he provided might be used in legal proceedings he is facing. Mr. Anderson and his mother were read a notification of rights form detailing the purpose of the evaluation and the limited confidentiality that applies. Each of them signed this form indicating their awareness of the conditions of the evaluation and signifying Mr. Anderson's willingness to participate in the assessment.

Name: Anderson, Curtis LaMario

Case No.: CC-01-0359

## FORENSIC EVALUATION REPORT

## SUMMARY OF ALLEGED

According to available information, the current charge against Curtis Anderson comes from an incident that occurred on October 26, 2001. It is alleged that an individual entered Weil's Clothing Store in Montgomery, Alabama and took assorted clothing valued at $137.00. Employees working in the business at that time stated that the person taking the clothing brandished a handgun during the incident. Following a police investigation, Curtis Anderson was arrested and charged with the current offense.

## DATA SOURCES

Information utilized in the current evaluation includes the following:

- Police reports and witness interviews provided by the Montgomery County District Attorney's Office.
- Information obtained from interviewing Dorothy Anderson, Curtis Anderson's mother.
- Information obtained from the direct evaluation of Curtis Anderson. The assessment of Mr. Anderson occurred in the offices of Clinical Psychologists P.C. of Montgomery, Alabama. The evaluation lasted two hours. It should be noted that the examiner has also requested records of Mr. Anderson's medical treatment at the UAB Internal Medicine Residency Program and Baptist Medical Center. As of the writing of this report, these medical records have not been received. Should any records reviewed lead to an alteration in the opinions expressed in this report, an addendum will be prepared.

## PERTINENT SOCIAL HISTORY

Curtis Anderson reports that he was born in Montgomery, Alabama and has lived here all his life. He is the second of five children born to his mother. He has one older brother and three younger brothers. Mr. Anderson reports that he does not see his older brother very frequently. He does report having good relationships with his younger brothers. At the present time Mr. Anderson is living at home with his mother. His mother is 52 years old and is retired from working with the Montgomery Board of Education. She used to work at Floyd School. He reports having a good relationship with his mother. Also at home during Mr. Anderson's early development was his father. His father is currently 56 years old and drives a cement mixing truck. Mr. Anderson stated that his father was not home much when he was growing up. His father worked a great many hours at a factory. Mr. Anderson reported having a "off and on" relationship with his father but stated that currently they have a satisfactory relationship.

Curtis Anderson reports that he has never been married. He does indicate that he has three children by two different women. He has a 17 year old daughter who lives in Montgomery. He does not see this child at all. He stated that he had a girlfriend with

Name: Anderson, Curtis LaMario                                                  3
Case No.: CC-01-0359

## FORENSIC EVALUATION REPORT

whom he had two children. He stated that they were enjoying a good relationship but that her mother intervened because of the interracial nature of the relationship. Mr. Anderson stated that his former girlfriend is now married to someone else and living in Bullock County, Alabama. Mr. Anderson states that he has a seven year old daughter and a three year old son by this woman. He did state that even though his former girlfriend is married to someone else, they continue to see each other on occasion. He did become tearful when talking about the reduction in the amount of time he does see his two young children.

Curtis Anderson reports that he went to public schools in Montgomery, Alabama. He went to a number of different elementary schools before attending Bellingrath Junior High School for the 7th through 9th grades. He then went to Lanier High School where he went until he was in the 11th grade. He then quit school in order to get a job and help support his oldest child. He stated that he was in special education classes for educably mentally retarded students. He reported that he did not show behavior problems on a frequent basis. He did admit to being expelled from school on one occasion.

Curtis Anderson reports having a very limited work history. He states that he has worked labor jobs in the construction field in the past. He also has performed odd jobs such as mowing lawns and raking leaves. He states that he has a problem working because when he becomes very hot he has a tendency to pass out. Mr. Anderson is not currently employed.

Curtis Anderson reports that he was diagnosed with thyroid cancer approximately one and a half years ago. He reportedly received treatment for this. He currently is taking Synthroid 0.08 mg. one per day. This medication is a synthetic thyroid hormone. He also was diagnosed with Hepatitis B approximately one year ago. He stated that after being diagnosed with this disorder he had to discontinue several other medications he was taking. Mr. Anderson stated that when he was 29 years old he sustained a head injury. He and one of his brothers got into an argument and they brother struck Mr. Anderson in the head with a two by four. Mr. Anderson reportedly received a skull fracture and lacerations after this incident. He reports that he was in Baptist Medical Center for two weeks and told to have bed rest for one month after his release from the hospital. Records of this hospitalization have been requested but not received as of the date of this writing. Mr. Anderson also reported that he was in Baptist Medical Center for one week after he was stabbed in the left shoulder and the left side of the chest.

Mr. Anderson reports that he uses tobacco excessively. He estimates that he will smoke up to three packs of cigarettes per day. He will also smoke cigars during the day. At the time of the evaluation he was carrying a partially smoked cigar in his hand. He also admitted to alcohol abuse. He stated that he tends to drink until he passes out. He stated that he has attempted to receive alcohol treatment in the past but was unable to pay for the evaluation or services. He did state that he would be interested in receiving alcohol treatment in the future. He did admit to using marijuana on an infrequent basis. He

Name: Anderson, Curtis LaMario
Case No.: CC-01-0359

4

## FORENSIC EVALUATION REPORT

stated that he would smoke a joint of marijuana "every now and then." He denied all other drug use. He stated that he had never received any formal mental health treatment.

## CLINICAL ASSESSMENT

On the date of the evaluation, Curtis Anderson appeared dressed in black jeans, black X-Files t-shirt, black baseball cap worn backwards, and white sneakers. He had a mustache and goatee. His grooming and hygiene were satisfactory. He initially appeared somewhat guarded and anxious, but as the evaluation proceeded he seemed to relax. He particularly seemed more comfortable when the examiner did bring his mother in while the nature and purpose of the evaluation was explained to him. Mr. Anderson was generally cooperative with the evaluation process.

As part of this evaluation Mr. Anderson's cognitive abilities were assessed. He was oriented as to time, place, person, and situation. His short-term memory skills were moderately impaired. He could only recall five digits forward and had difficulty recalling digits backwards. He was only able to recall two digits in reverse order. His recent and remote memory skills were satisfactory. His attention and concentration skills were limited. He could only perform the most simple mathematical calculations. He had greater difficulty when asked to perform tasks requiring more sustained concentration. He was limited in his ability to reason abstractly. He was unable to interpret proverbs even when he had been presented with examples of correct interpretations of proverbs. He did not know the name of the current president of the United States but did know that Bill Clinton was the previous president. His knowledge of current events was impoverished. When presented with hypothetical social situations, he displayed some impairments in his judgment skills. It is estimated that he is functioning in the borderline range of intelligence.

Curtis Anderson's speech was normal in productivity and flow. He spoke in a normal tone and did not exhibit any peculiarities in the form of his speech. He did have a tendency to use the term "man" at the end of sentences when talking and answering questions. Generally his speech was understandable and coherent.

Curtis Anderson's thoughts were normal in productivity and logical in structure. He did show a somewhat simple thought quality. When questioned about possible experiences of auditory or visual hallucinations, he described what sound like common perceptual illusions. These do not appear to be true examples of auditory or visual hallucinations. He did not exhibit any delusional thinking. He did report that one time in the past he attempted suicide. When asked how he had attempted this, he stated that he sat and drank an entire bottle of liquor. He did not receive medical treatment for this. He did admit to some thoughts of suicide but not having any specific plan or no immediate intent. He did state that he had thought of hurting other people when they took thinks that did not belong to them. Apparently he has been the victim of burglary and theft in recent months.

Name: Anderson, Curtis LaMario                                                5
Case No.: CC-01-0359

## FORENSIC EVALUATION REPORT

Curtis Anderson displayed a normal level of motor activity. He displayed satisfactory
eye contact. He did have a tendency to sit slumped over in his chair. As was mentioned
earlier, he held an unlit, partially smoked cigar in his right hand throughout the
evaluation. He did not exhibit many gestures. His facial expressions were within normal
limits.

Curtis Anderson's affect, that is the outward expression of his emotional state was normal
in quality and range. He displayed appropriate control over his affective expression. He
did not show any signs of quickly changing emotion that might be indicative of serious
psychopathology. He reported that he stays up during most of the night and sleeps during
the day. He estimates that he will go to bed around 3 a.m. and wake up around 11 a.m..
He states that he has a good appetite and his weight has not changed. He denied
experiencing any spontaneous crying spells.

In summary, the clinical evaluation of Curtis Anderson finds him to be a man of
estimated borderline intellectual functioning. He reportedly was in classes for educably
mentally retarded students when he was in school. He also has what sounds like a serious
problem with alcohol. It sounds as if he drinks to excess when he does imbibe in alcohol.
According to information provided by his mother, his behavior does change significantly
when he has been consuming alcohol. Based upon the results of the current evaluation
the following psychological diagnoses appear most appropriate:

## DSM-IV DIAGNOSES

Axis I          Alcohol Dependence (303.90)

Axis II         Borderline Intellectual Functioning (62.89)

Axis III    --  History of Thyroid Cancer; Hepatitis B

## FORENSIC ASSESSMENT

## COMPETENCY TO STAND TRIAL

        Curtis Anderson's capacity to function in the role of defendant was assessed
utilizing the Competency to Stand Trial Assessment Instrument (CAI). The CAI consists
of a semi-structured interview which assesses an individual's knowledge and functioning
in 13 areas believed to be important in assessing their understanding of the charge against
them and their ability to participate in the preparation of an adequate defense. Mr.
Anderson had only two areas in which he was rated as being mildly impaired. Both of
these mild impairment ratings came as the result of his borderline intellectual
functioning.

Name: Anderson, Curtis LaMario                                    6
Case No.: CC-01-0359

## FORENSIC EVALUATION REPORT

More specifically he had a good appreciation for the charge against him. He had a clear understanding of the serious nature of this offense. He had a good appreciation for possible consequences that could occur should he be found guilty of this offense. He had realistic appraisals of possible outcomes in the case. He had a good knowledge of the identity and role of various individuals who could be involved in legal proceedings he is facing. He was rated as being mildly impaired in his understanding of court procedure. He required some remediation in areas such as his not having to tell his side of the story in a trial to ascertain guilt or innocence. However, with remediation he seemed to understand this concept. Mr. Anderson did volunteer that he watches a lot of court and legal shows on television so he does have some understanding of court procedure.

Curtis Anderson appears to have sufficient verbal skills and intellectual ability to disclose pertinent facts to his attorney. He was able to give a description of possible legal defenses that could be used in a criminal case. He reports that he has a satisfactory relationship with his attorney. He required some remediation when asked to define the concept of a plea bargain. With this remediation he was able to describe this concept. Mr. Anderson was seen as having no self-defeating motivation that might cause him to sabotage efforts to defend him. He appears to be at very low risk to exhibit unmanageable behavior in the courtroom. He does appear to have the basic verbal skills and intellectual skills to challenge prosecution witnesses. He was rated by this examiner as being mildly impaired in his capacity to testify relevantly. This rating of mild impairment was assigned due to Curtis Anderson's borderline intellectual functioning. His intellectual limitations might make it difficult for him to testify relevantly or to respond to questions in cross examination.

In summary, Curtis Anderson had only two areas in which he was raised as mildly impaired on the CAI. These ratings of mild impairment are due to his borderline intellectual functioning. Even with these areas of mild impairment, it is this examiner's opinion that Curtis Anderson is capable of assuming the role of defendant in a criminal case at this time.

## MENTAL STATE AT TIME OF OFFENSE

The information used in the formulation of this opinion is based on police reports and witness interviews provided by the Montgomery County District Attorney's Office; information obtained from interviewing Dorothy Anderson, Curtis Anderson's mother; and the direct evaluation of Curtis Anderson. Based on the information available, it would appear that on the date of the alleged offense, Curtis Anderson was actively involved in alcohol abuse. It does appear that he was possibly intoxicated during the time frame in which the alleged robbery occurred. It also appears that he may have been experiencing some emotional distress related to seeing his former girlfriend. They apparently were having some disagreement over her not spending time with him and asking him to take care of their two young children. This distress appears to have been of a transient nature related to the specific disagreement they were having rather than any

Name: Anderson, Curtis LaMario
Case No.: CC-01-0359

## FORENSIC EVALUATION REPORT

reflection of an ongoing psychological or psychiatric disorder. The information reviewed did not indicate that at the time of the alleged offense Curtis Anderson was suffering from any psychological disorder or condition that would have impaired his ability to known right from wrong or appreciate the criminality of his actions. The only factor that does appear to contribute to his behavior is the acute, voluntary, intoxication.

## COMPETENCY TO WAIVE MIRANDA RIGHTS

Curtis Anderson's capacity to understand the elements of the standard Miranda warning was assessed utilizing a technique recommended by Dr. Thomas Grisso. This procedure involves showing the individual statements reflecting the essential elements of the Miranda warning. The individual is then asked to explain these concepts in his own words. Mr. Anderson performed well on this task.

More specifically he stated that the first part of the Miranda warning meant that he did not have to say anything. He indicated that the second statement meant that if you did tell police something that they can "turn it around on you in court." He stated that the third part of the Miranda warning meant that he could have a lawyer with him when he talked. He stated that the fourth part of the Miranda warning meant that they would give him a "state lawyer" if he could not pay for his own lawyer. Mr. Anderson stated that he did understand the Miranda warnings that were read to him at the time he was questioned by police. He did state that the officer who read the warning to him was a friend from school with whom he had played football. He believed that this individual would be understanding of him in the questioning. This was his reason for allowing the questioning to take place. Based upon Mr. Anderson's report as well as his performance on the Grisso Technique, it is this examiner's opinion that Curtis Anderson was able to understand his Miranda warning and make an informed decision whether to retain or waive these rights at the time he was questioned by police officers.

## SUMMARY AND RECOMMENDATIONS

Curtis Anderson is a 36 year old single African American male who currently is charged with Robbery I. The Honorable Eugene Reese, Circuit Court Judge of Montgomery County ordered that Curtis Anderson undergo forensic psychological evaluation to provide the court with information regarding Mr. Anderson's mental state as it applies to his competency to stand trial, mental state at the time of the offense, and competency to waive Miranda Rights.

A clinical evaluation of Curtis Anderson finds that he is a man of estimated borderline intellectual functioning. He reportedly was in special education classes for educably mentally retarded individuals when he was in school. He also describes a significant history of alcohol abuse that appears to reach the level of alcohol dependence. The psychological diagnoses that appear most appropriate for Curtis Anderson are those of alcohol dependence and borderline intellectual functioning.

Name: Anderson, Curtis LaMario                                               8
Case No.: CC-01-0359

## FORENSIC EVALUATION REPORT

The forensic evaluation of Curtis Anderson found a few areas of mild impairment on the Competency to Stand Trial Assessment Instrument (CAI).  These ratings of mild impairment were related to his borderline intellectual functioning.  Even with these impairments, he does appear capable of understanding the charge against him and participating in the preparation of an adequate defense.  Mr. Anderson's attorney may need to be granted some additional time or leeway to insure that Mr. Anderson understands what is going on in court as the case proceeds.

Available information would indicate that at the time of the alleged offense, Curtis Anderson was acutely intoxicated with alcohol.  He was actively engaged in the abuse of alcohol.  He also was experiencing some acute distress related to relationship difficulties with a former girlfriend.  However, there were no indications of any psychological disorder or condition that would have prevented him from knowing right from wrong at the time of the alleged offense.

Curtis Anderson's ability to understand the Miranda warning read to him by police was assessed utilizing a technique by Dr. Thomas Grisso.  Mr. Anderson performed well on this task and indicated that he was aware of the four elements of the standard Miranda warning.  It would appear that at the time he was questioned by police, Mr. Anderson was not suffering from any psychological disorder or condition that would have prevented him from making a voluntary and knowing waiver of these rights.  His decision may have been influenced by the fact that he knew the police officer who was questioning him.

Regardless of the outcome of this case, it is strongly recommended that Curtis Anderson be provided with alcohol treatment.  He reportedly has considered becoming involved in treatment in the past but has not done so because of a limited ability to pay for this treatment.  He does state that he is motivated to obtain treatment at this time.  It is recommended that he be afforded this opportunity at the earliest available opportunity.

As a mental health professional I am certainly aware that decisions regarding an individual's competency to stand trial, mental state at the time of offense, and competency to waive Miranda Rights are properly matters for the court to decide.  Therefore the opinions expressed in this case should be viewed as an advisory nature only.

Respectfully Submitted,

Guy J. Renfro, Ph.D.
Licensed Psychologist
Certified Forensic Examiner

GJR/jlm

**Name: Anderson, Curtis LaMario**
**Case No.: CC-01-0359**

9

## FORENSIC EVALUATION REPORT

Cc: Mary Bloodsworth, Court Administration
    Stacy Brown, District Attorney's Office
    Defense Attorney



C-3
205183

STATE'S
EXHIBIT

| State of Alabama<br>Unified Judicial System<br><br>ᵀᵐ ARAP-14      Rev. 11/91 | **CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL BY TRIAL CLERK** | Appellate Case Number<br><br>_____ |

| TO: THE CLERK OF<br>     THE COURT OF CRIMINAL APPEALS OF ALABAMA | DATE OF<br>NOTICE OF APPEAL: | 11-1-2001 |

| APPELLANT | CURTIS LAMARIO ANDERSON |

| v.   STATE OF ALABAMA |

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of _____ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of this certificate has this date been served on counsel for each party to the appeal.

DATED this ____27____ day of ___Dec.___, __2001__.

_Melissa Pittman_
_____
Circuit Clerk

R-1

1                IN THE FIFTEENTH JUDICIAL CIRCUIT

2                IN AND FOR MONTGOMERY COUNTY

3                     MONTGOMERY, ALABAMA

4

CURTIS LAMARIO ANDERSON )
5                        )
              Appellant,   )
6                        )
vs                       )    CASE NO. CC-2001-359-R
7                        )
STATE OF ALABAMA,        )
8                        )
              Appellee.    )
9    _____

10

11       COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS
                     JURY TRIAL
                September 25, 2001
12

                       BEFORE
13        THE HONORABLE EUGENE W. REESE
                   COURTROOM 4-B
14        MONTGOMERY COUNTY COURTHOUSE

15

                    APPEARANCES
16
FOR THE APPELLANT:   JAMES H. PORTER, III, ESQUIRE
17                   Attorney at Law

18   FOR THE APPELLEE:   DARYL BAILEY, ESQUIRE
                   Deputy District Attorney
19

20

21

22

23
                OFFICIAL COURT REPORTER
24                 Jackie Bonnett, CSR

25

*[Stamp: DEC 2001 FILED Melissa Rittenour Circuit Clerk]*

i

## I N D E X

Voir Dire of jury.........................2
Jury given oath..........................12

Opening Statements:
  Mr. Bailey...............................16
  Mr. Porter...............................20

WITNESSES:
    BETTY JACKSON:
        Direct...........................24
        Cross............................30

    PAKETA MAYS:
        Direct...........................41
        Cross............................47

    EUGENE SMITH:
        Direct...........................54
        Cross............................62

    J. S. GRIER:
        Direct...........................73
        Cross............................82

Motions............................83, 85

Closing Arguments:
  Mr. Bailey...............................86
  Mr. Porter...............................87
  Mr. Bailey...............................93

Judge's charge to the jury..............102

Verdict.................................119

ii

EXHIBIT INDEX

STATE'S EXHIBITS:

     1 - Miranda Rights....................78
     2 - Tape of Statement................80

DEFENDANT'S EXHIBITS:

     1 - Psychological Report.............85

* * * * * *

R-2

1      (SEPTEMBER 25, 2001:  The jury

2          venire was brought into open court

3          and the following proceedings

4          occurred.)

5      THE COURT:  Ladies and gentlemen, how

6   are you today?  My name is Gene Reese.  We

7   are glad you are here with us to be working

8   today.  I am glad you are serving on jury

9   duty, and I hope it will be a good experience

10  for you this week.

11      We are going to select a jury today in

12  the case of State of Alabama versus Curtis

13  Anderson.

14      Mr. Anderson, would you please stand?

15  This is Mr. Anderson.  He is being

16  represented by Mr. Jim Porter.  Thank you,

17  gentlemen.  You can have a seat.

18      As this is a criminal case, the State of

19  Alabama is being represented by the District

20  Attorney's office.  This is Mr. Daryl Bailey.

21  And assisting him in jury selection is Mr.

22  Jimmy Doyle.

23      Ladies and gentlemen, just as I have

24  introduced these parties and lawyers to you,

25  I am going to ask when your name is called if

R-3

1    you would please stand so you can be

2    introduced.  Please state your occupation, if

3    you are married or single, and the occupation

4    of your spouse.

5              (The court reporter calls the

6              roll.)

7         THE COURT:  Ladies and gentlemen, do any

8    of you know Mr. Anderson, the defendant in

9    this case?  Are you related by blood or

10   marriage to him to the best of your

11   knowledge?

12        Do any of you know Jim Porter, his

13   lawyer?  Are you related by blood or marriage

14   to him, ever been represented by Mr. Porter?

15        Do you know Mr. Daryl Bailey or Mr.

16   Jimmy Doyle, who are the prosecutors in this

17   case?  Are you related by blood or marriage

18   to them, ever been represented by them?

19        Did any of you serve on the Grand Jury

20   that returned this indictment in March of

21   2001?  Did you serve on the Montgomery County

22   Grand Jury in March of 2001?

23        Mr. Anderson, the defendant, is charged

24   with the offense of robbery in the first

25   degree.  This is alleged to have occurred

R-4

1    October 26 of the year 2000 at 1143 hours on

2    South Court Street, which is, I believe, at

3    Weil's Clothing Store on South Court Street.

4        I mention that to ask you this question.

5    To the best of your knowledge, do any of you

6    know anything about this case?  Have you

7    heard anything or read anything about this

8    case?

9        Do any of you know potential witnesses

10   that may testify?  They include Elizabeth

11   Ervin, Betty Jackson, and Detective M. K.

12   Hameed with the Police Department.  Do any of

13   you know any of those potential witnesses

14   that may testify in this case?

15       Also, other witnesses may include Pamela

16   Boyd, Betty Jackson, Paketa Mays, Eugene

17   Smith.  And police officers also that may

18   testify include J. S. Grier and S. E. Wilson.

19   Do you happen to know any of those

20   individuals to the best of your knowledge?

21       Ladies and gentlemen, I mentioned that

22   this case comes to us by way of an indictment

23   from the Montgomery County Grand Jury in

24   March of this year.  You have all told me

25   that none of you served on that jury.  That

R-5

1    Grand Jury determines whether or not there is

2    probable cause for an indictment to be

3    returned.

4        This indictment is not evidence of the

5    guilt or innocence of any party.  This

6    indictment is the legal paperwork that puts

7    the defendant on notice of the charges

8    against him.

9        Are there any of you that disagree with

10   that basic statement of law and feel that

11   someone is automatically guilty because they

12   have been indicted?

13       Do each of you also understand that the

14   law says all defendants are presumed

15   innocent, and the presumption of innocence is

16   a piece of evidence to be considered by you,

17   and the burden of proof is upon the State of

18   Alabama to prove their guilt beyond a

19   reasonable doubt?  Are there any of you that

20   disagree with that basic statement of law?

21       Any other questions from the State?

22       MR. BAILEY:  Your Honor, just a few.

23   Good morning, ladies and gentlemen.

24       As the Judge told you, my name is Daryl

25   Bailey.  I represent the State of Alabama in

R-6

1    this case.  I work for the District

2    Attorney's office here in Montgomery County.

3    Our District Attorney is Ellen Brooks, and I

4    am one of her assistants, as well as Mr.

5    Doyle here that's going to be helping me in

6    jury selection.

7         I don't perceive anyone having any

8    problems with any of my questions, but if

9    someone feels uncomfortable answering one of

10   my questions in front of the whole group,

11   just remain behind after the Judge has

12   dismissed you and we will take up any

13   concerns or any questions or any follow-ups

14   that you might have.

15        Just for purposes of my question, if you

16   have an answer, just raise your hand or speak

17   up, and we will address it.

18        The first question I would like to ask

19   you, is there anyone in this group that has

20   to be one hundred percent sure or that would

21   have to be one hundred percent sure that a

22   person is guilty before you would vote to

23   convict that person?  Is there anyone that

24   feels that way, that you have to be one

25   hundred percent convinced that someone is

R-7

1    guilty in order for you to be able to

2    convict?  It is okay to feel that way.  I see

3    several of you raising your hands.

4        I want to ask you before -- I see a lot

5    of you.  I want to ask a follow-up question

6    and then if you answer it in the affirmative

7    after I ask my follow-up question, I would

8    like to get your names.

9        The burden on the State of Alabama in

10    criminal cases, and it is the same in every

11    other jurisdiction in the United States, is

12    beyond a reasonable doubt.  It is not beyond

13    all doubt.  It is not to a hundred percent

14    certainty or to a mathematical certainty.  In

15    order for someone to be a hundred percent

16    sure that someone committed a crime, you

17    would almost have to be a witness to that

18    crime, and that would, therefore, disqualify

19    you of serving as a juror if you are a

20    witness.

21        The burden that's placed on the State in

22    this case and in every other criminal case is

23    simply beyond a reasonable doubt.

24        Does anyone, after kind of explaining

25    that little caveat to the law, does anyone

R-8

1    have a problem with that?  Those that still

2    say I am going to have to be one hundred

3    percent convinced, that's fine.

4         Is there anyone else that still feels

5    that way?  Nobody else?  I assume by your

6    silence, that everyone that raised your hand

7    originally now is kind of clear on what I am

8    asking and agrees with the burden in this

9    case.  Is that correct?

10         The next question I have could be based

11   on any type of religious reasons or any other

12   personal reasons that you might have.  Is

13   there anyone that has a problem sitting in

14   judgment of another person?  Of course,

15   that's what you will be asked to do if you

16   are selected for this jury or any other jury,

17   is to sit in judgment of another person,

18   judge that person.  There are some people I

19   have found throughout my prosecutorial

20   career, that just does not like to do that,

21   that have religious beliefs that they believe

22   prevent them from doing that.  We certainly

23   respect those, but, once again, we need to

24   know about them.  Is there anyone that just

25   has a problem sitting in judgment of another

R-9

1    person?

2         My next question is similar to that

3    question, but it is a little different.    Is

4    there anyone that has any religious beliefs

5    or any other beliefs that would prevent you

6    from finding someone guilty of a crime?

7    Anyone have any type of religious beliefs or

8    any other beliefs that would prevent you from

9    finding someone guilty of a crime?

10        Are there any of you that have any

11   problems with the Montgomery Police

12   Department, have any negative feelings about

13   the Montgomery Police Department?  And that

14   can be as simple as getting a ticket that you

15   didn't deserve.  Some of us may have done

16   that.  Does anyone have a deep-rooted problem

17   with the Montgomery Police Department?  If

18   you have a Montgomery Police officer come up

19   here and testify, that you are just going to

20   hold it against them?  Does anyone have those

21   kind of feelings?  Or any other law

22   enforcement agencies for that matter.  That

23   could be the Sheriff's Department, the FBI,

24   ABI, anything like that.  Does anybody have a

25   problem with any of those law enforcement

R-10

1    agencies?

2         My next question I know a lot of you are

3    going to answer in the affirmative. Every

4    time I ask the question, I do have a lot of

5    affirmative answers. But I have a follow-up

6    question once again. So kind of raise your

7    hand or whatever. Wait until my follow-up

8    question, and if you still have the answer,

9    we will take your name. Do any of you

10   regularly watch television shows that depict

11   courtroom dramas? These can be supposedly

12   real court like Judge Judy or People's Court

13   or even the dramas like Law and Order and

14   reruns of L.A. Law and things like that. I

15   see a lot of you nodding or raising your

16   hands that you do watch the shows, and that's

17   fine.

18        My follow-up question to that is does

19   everyone understand that a lot of those

20   shows, first of all, are written in

21   Hollywood, and, second of all, that the laws

22   that are depicted on those shows are not

23   necessarily the laws as they are in the State

24   of Alabama? Does everyone understand that?

25        The law in the State of Alabama is going

1    to be given to you by Judge Reese at the end

2    of this case.  He does a far better job than

3    I in explaining the law.  That's who you are

4    supposed to listen to.  In this case and in

5    every other case that comes before him, you

6    listen to him, and he is going to explain the

7    law to you to the best of his ability.  Does

8    anyone have a problem relying on Judge Reese

9    explaining the law and not relying on The

10   People's Court or Judge Judy?  Does anyone

11   have a problem with that?

12        In the State of Alabama there are

13   certain degrees to a lot of crimes.  For

14   instance, we in the State of Alabama have

15   three degrees to robbery.  We have robbery in

16   the first degree, robbery in the second

17   degree, and robbery in the third degree.

18        Robbery in the first degree is basically

19   when you go in to take someone else's

20   property, and you either do it using some

21   type of deadly physical force or a threat of

22   deadly physical force, or it is implied by

23   the fact that you have a weapon.  Robbery in

24   the second degree is when two people are

25   together and they are committing that type of

R-12

1    crime.  There is another person.  And robbery

2    third degree is basically when you just go in

3    without a threat of force or a weapon and you

4    take someone's property by force but you are

5    not armed with any type of deadly weapon or

6    you are not threatening deadly physical

7    force.

8        Does everyone kind of understand those

9    basic explanations of robbery?  My question

10   to you, based on those explanations, is the

11   way the law is written in the State of

12   Alabama, and I am telling you this to see if

13   anyone has a problem with it.  I don't make

14   the laws.  The Legislature makes the laws.

15   We are just here to enforce it.  But if you

16   have a problem with it, we need to know.  In

17   robbery in the first degree, a person can be

18   convicted of robbery in the first degree even

19   if they don't have a weapon.  If they go into

20   a place or go up to a person and say I am

21   going to kill you or I am going to shoot you

22   or I am going to do this to you if you don't

23   give me the property and that person who is

24   being robbed feels like their life is in

25   danger, you have got a Robbery I.  That

R-13

1    person might not even have a gun, but if they

2    use those words and that person feels their

3    life is in danger, then it is robbery in the

4    first degree.

5         Does anyone have a problem with that

6    basic law? Does anyone have a problem that a

7    person can be convicted of robbery in the

8    first degree whether or not they had a gun?

9    So by your silence, I assume that everyone is

10   in agreement with the laws that has been

11   written by the State of Alabama? No one has

12   a problem with that? Thank you for your

13   honesty on all those questions.

14        My last question may be one that someone

15   may need to stick around for. Is there

16   anyone that has any problems sitting on a

17   jury, any other things I have not addressed?

18   Do you have any concerns, whether it be

19   health issues, if you have got something to

20   do this afternoon and would rather not be

21   here? Is there anyone that has any other

22   issues, you are certainly welcome to stick

23   around if you don't want to discuss them.

24        THE COURT: Mr. Porter, any additional

25   questions?

R-14

1      MR. PORTER:  No, sir, Judge.

2      THE COURT:  Ladies and gentlemen, we

3   will complete the selection process.  This

4   ought to take us about fifteen minutes, so

5   you can take a short recess and stretch your

6   legs.  Please reconvene in the jury assembly

7   room on the third floor, our court reporter

8   will be down to give you additional

9   instructions at approximately 11:30.  You are

10  in recess until 11:30.

11      (Venire excused.)

12      PROSPECTIVE JUROR:  I am Maggie Smith

13  Moon.  I am not familiar with the gentleman,

14  but someone knows me and said hello, Ms.

15  Moon.  They know me.  I just don't remember,

16  but they know me.

17      THE COURT:  Somebody on the jury?

18      PROSPECTIVE JUROR:  No.

19      THE COURT:  Somebody out in the hall?

20      PROSPECTIVE JUROR:  Yes.

21      THE COURT:  But you don't know who they

22  are?

23      PROSPECTIVE JUROR:  No, I have no idea.

24  But they know me.  I don't know if they are

25  affiliated with this case.  Someone knows me

R-15

1    out there, and they called my by name.

2        THE COURT:  Thank you for sharing that

3    with us.

4            (Prospective juror excused.)

5        THE COURT:  First off, Juror 29 was

6    excused today.  That's the reason he is not

7    here.  Mr. Ward, I believe, indicated he

8    couldn't follow the instructions dealing with

9    burden of proof.  That's Juror 415, so he

10   will be excused.  That leaves us with an odd

11   number, so we will excuse Juror 373 who just

12   spoke to us now just to even the panels.  I

13   believe with that, that should leave us with

14   thirty jurors, nine strikes each.

15            (The jury was struck and placed in

16             the jury box and administered the

17             oath of service.  The following

18             occurred in the presence and

19             hearing of the jury:)

20       THE COURT:  We are prepared to begin at

21   this time.  We will have the opening

22   statements, then the presentation of

23   evidence, then the closing remarks.  The

24   State will go first because they have the

25   burden of proof.  Mr. Bailey.

R-16

1      MR. BAILEY:  Thank you, Your Honor,

2      counsel.  Ladies and gentlemen, it was on

3      October 26 of last year, almost a year ago,

4      that a pretty traumatic event happened at a

5      local business here in our community here in

6      Montgomery.  It almost seems run of the mill

7      these days, but it wasn't to the individuals

8      that were working at Weil's Clothing Store in

9      Montgomery.  Mr. Eugene Smith, who you will

10     hear from a little later in this case, was

11     there, along with some of his employees,

12     Paketa Mays, Betty Jackson, and Elizabeth

13     Irvine doing as many of us do every day,

14     working for a living, striving to make money

15     for their families.  It was on this

16     particular day that the defendant in this

17     case, Curtis Anderson, came in to their

18     store, and he came in with another female who

19     was about the same age as him, and they had

20     an approximately one-year-old baby with them.

21     These employees of this store is going to

22     tell you that not long after Mr. Anderson had

23     entered the store, they noticed something was

24     kind of peculiar about him.  They are going

25     to tell you why they thought that.  But they

R-17

1    are going to tell you that he had come into

2    the store with this lady.  They had left.  He

3    came back into the store a few minutes later.

4    At some point in time during the time that

5    Mr. Anderson was in the store, he was going

6    from rack to rack in the clothing store and

7    taking clothes and putting them on top of the

8    racks.  One of the employees, I believe Ms.

9    Jackson, is going to tell you she thought

10   this was kind of odd going from rack to rack

11   putting the clothes on top, so she asked him

12   if she could help him, to which he replied

13   no.  So she said, well, do you intend on

14   purchasing these clothes?  She is going to

15   tell you that when she started asking him

16   these questions, he started to getting a

17   little irate with her.  At some other point

18   in time the defendant left the store again

19   with this lady he was with originally, and

20   they are going to tell you he came back into

21   the store a third time a few minutes later.

22        It was at that time he continued to do

23   what he was doing before he had left.  Ms.

24   Jackson is going to tell you that she was

25   going behind him putting the clothes back on

R-18

1    the rack trying to keep the store in order

2    and that he came in this third time and

3    started taking the clothes.  At some point in

4    time Mr. Smith confronted him, Ms. Jackson

5    became alerted because the defendant started

6    raising his voice and started hollering.  So

7    she goes to the back and calls the Montgomery

8    Police Department, dials 911.

9        They are going to tell you that they

10   confronted him and told him he was going to

11   have to stop doing what he was doing or he

12   was going to have to purchase some clothes,

13   and he started using foul language and

14   started hollering at them and taking clothes

15   and saying, if any of you try to stop me, I

16   am going to blow your f'ing heads off, the

17   whole time pointing at his waistband.

18       Ms. Jackson is going to tell you she saw

19   what she believes to be a gun in his

20   waistband and that he was certainly motioning

21   for the gun and telling them, I am going to

22   come in here, and I am going to kill all of

23   y'all, I am going to blow your f'ing heads

24   off if you don't leave me alone, at which

25   time he takes the clothes that he has

R-19

1   gathered from these racks, and he exits the

2   store.

3       The three employees of Weil's Clothing

4   that are going to testify before you today

5   are going to tell you several things.  One,

6   they are going to tell you about the

7   defendant's erratic behavior.  They are going

8   to tell you about the fact that he threatened

9   their lives.  They are going to tell you

10  they, indeed, believed he was armed and that

11  he would use his weapon.

12      There is not going to be any testimony

13  in this case, ladies and gentlemen, that he

14  pulled out a weapon and pointed it at them

15  point blank.  But that's what we talked about

16  a little in voir dire.  That's not required

17  in the State of Alabama.  Simply what is

18  required is that he made the threat and that

19  they believed this threat.

20      That's the case.  Curtis Anderson was

21  picked up a little later.  The employees at

22  the store had done a, what we call, a photo

23  composite and described what he looked like.

24  The Montgomery Police Department tracked Mr.

25  Anderson down, picked him up.  He was

R-20

1    identified by the victims.  Mr. Anderson was

2    brought in and was questioned by Detective

3    Grier with the Montgomery Police Department.

4    It was at that time that Detective Grier will

5    testify and we will also play a taped

6    recorded statement that he took from Mr.

7    Anderson.  It was at that time Mr. Anderson

8    admitted he had gone into the store to take

9    the clothes.

10         Basically what this case is going to

11   boil down to, ladies and gentlemen, is who

12   you believe, the credibility of stories.  I

13   think at the end of this case you are going

14   to look at the victims in this case, and you

15   are going to believe they are telling you the

16   truth, that they were in fear of their lives,

17   that he took the clothing from their store

18   and they felt he was a danger to them.

19         That's this case.  It shouldn't be a

20   long case, but it is a very important case to

21   the defense, and it is a very important case

22   to the State of Alabama.  Thank you.

23         THE COURT:  Mr. Porter.

24         MR. PORTER:  Good afternoon, and, again,

25   my name is Jim Porter.  Let me say one thing

1    the Judge will tell y'all again at the end of

2    this trial, and that is what I say and what

3    Mr. Bailey says is not evidence in this case.

4    We both have a job to do.  He does his very

5    well.  But our statements are not evidence.

6         One thing I want to say though is Mr.

7    Bailey said a minute ago somebody said there

8    was something kind of peculiar about Mr.

9    Anderson, and that statement is true.  Mr.

10   Anderson is thirty-six years old.  When he

11   was in school, he was in a class for people

12   that they called educably retarded.  He does

13   not think the same way that you and I do.

14   You will see evidence presented to that

15   effect.

16        Also, he had an altercation at some

17   point where one of his brothers hit him in

18   the head with a two-by-four, which put him in

19   the hospital for a period of time, after

20   which he had to take medication for seizures

21   which were caused from the injury.

22        More recently he had thyroid cancer.

23   When that happened, he had to quit taking the

24   medication that he was taking for his

25   seizures because something about the medicine

R-22

 1    for the thyroid cancer conflicted with that.

 2    Also, I think you will hear evidence that he

 3    is an alcoholic, and I think he has got drug

 4    problems.

 5         What happened on that day, I think that

 6    the evidence will show, is that Mr. Anderson

 7    went into the clothing store that day and

 8    said he saw a couple of outfits that he

 9    liked, and he took them.  We know that

10    because he told the police, I saw a couple of

11    outfits I liked and I took them.

12         Mr. Bailey talked to you earlier about

13    the three types of robbery that we have in

14    Alabama, the first degree, second degree, and

15    third degree.  What I'll offer to you now

16    that I think the evidence will prove that

17    what, in fact, occurred in this case was a

18    theft, a shoplifting.  I believe the evidence

19    will show you he was drunk on the day he went

20    into the store and took the two outfits.

21    What Mr. Anderson is guilty of in this case

22    is of a theft, a shoplifting.  I believe the

23    clothes were worth a hundred thirty-nine

24    dollars.

25         We will hear from the witnesses who were

R-23

1    working in the store that day, and at no

2    point in the trial will you hear me attempt

3    to say that it would not be horrifying to

4    have someone in the store that you thought

5    was trying to steal something or trying to

6    rob something.  I think, in fact, what their

7    testimony will show is that, yes, in a

8    peculiar manner Mr. Anderson was in there

9    throwing pants on top of the display, and

10   they asked him about it, and I think he got a

11   little paranoid.

12       His mother is friends with a woman who

13   works there at the store, and he asked, what

14   are you doing?  Why are you looking at me

15   funny?  And he asked one of them at some

16   point is that woman here with the glasses?

17   He didn't know her name, but he knew that was

18   a friend of his mother.  I think he became

19   very agitated, irrationally agitated.  But he

20   did not have a weapon that day, he did not

21   rob the store.  What he committed was truly a

22   shoplifting, and I'll come back to that at

23   the end of the trial and just ask you at this

24   point to listen to the testimony.

25       THE COURT:  Call your first witness.

R-24

1        MR. BAILEY:  The State will call Betty

2    Jackson.

3                * * * * * * *

4                BETTY JACKSON

5        The witness, called by the State, after

6    having first been duly sworn to speak the truth, the

7    whole truth, and nothing but the truth, took the

8    stand and testified as follows:

9                DIRECT EXAMINATION

10   BY MR. BAILEY:

11   Q.    Would you please state your name for the

12         ladies and gentlemen of the jury?

13   A.    Betty Jackson.

14   Q.    Ms. Jackson, get right to the point, and I am

15         going to ask you about some events that

16         happened in October of last year.  Can you

17         tell us where you were employed around that

18         time?

19   A.    Weil's Clothing.

20   Q.    Where is that store located?

21   A.    3871 South Court Street.

22   Q.    That's in Montgomery?

23   A.    Yes.

24   Q.    What do you do for Weil's Clothing?

25   A.    Sales clerk.

R-25

1    Q.   Do you recall whether or not you were working

2         on the date of the 26th of October?

3    A.   Yes.

4    Q.   And did anything unusual happen in the store

5         on that day?

6    A.   Yes, it did.

7    Q.   Can you tell us about it?

8    A.   We got robbed.

9    Q.   If you could, go through the events.  You say

10        you got robbed.  If you can start from the

11        very beginning of everything you remember and

12        just kind of take us through that situation.

13   A.   Okay.  Can I say his name?

14   Q.   I am sorry?

15   A.   Can I identify the person that came in the

16        store?

17             THE COURT:  Just answer the question

18        right now.  He will get to that.

19   Q.   When did you first see the person that you

20        say robbed you?

21   A.   He came in with a young lady.

22   Q.   Tell us about that.  What did you notice, and

23        what was happening?

24   A.   They came in the store with a young lady, and

25        she had a little baby.  The first time they

R-26

1        came in the store, they was just walking

2        around looking.  So they left back out.  So

3        they came back in a second time, and she

4        would just pick up stuff like what she was

5        going to buy or whatever.  Then the third

6        time they came in, the young man came in by

7        himself.

8    Q.   What happened during that time?

9    A.   He started picking up stuff off the racks.

10       He had about seven or eight jeans.  He

11       started throwing it over the racks.  I was

12       telling him he couldn't leave the clothes on

13       the racks like that.  He just started

14       grabbing them.  He was going from rack to

15       rack.  So we knew he was going to run out of

16       the store with the stuff, but we never

17       expected him to, you know, threaten us or

18       anything.

19   Q.   Let me back up just a minute.  If I counted

20       correctly, you testified he came in three

21       sometimes so far.

22   A.   Yes.

23   Q.   During the first and second time he came in,

24       did you engage in any conversation with him

25       at all?

R-27

1   A.   No.

2   Q.   Was he doing anything unusual those first two

3        times?

4   A.   The second time he came in, he sat in the

5        window while she looked around.

6   Q.   So basically from what you could tell, he was

7        just kind of waiting on her?

8   A.   Yes.

9   Q.   The third time that you say he came in, he

10       was by himself?

11  A.   Yes.

12  Q.   And just for the Record, the person that you

13       talked about as coming into the store on the

14       third time, is that person in the courtroom

15       today?

16  A.   Yes.

17  Q.   If you could, please point him out.

18  A.   He is sitting right there.

19            MR. BAILEY:  For the Record, she

20       identified the defendant in this case, Curtis

21       Anderson.

22  Q.   Let's talk about this third time.  You

23       testified that he was throwing some clothes

24       up on top of the rack and you basically told

25       him he couldn't do that?

R-28

1   A.  He was mainly asking about our manager.

2   Q.  Tell us about that.

3   A.  He just asked where was that loud mouth lady

4       that worked there.  So I said, what loud

5       mouth lady?  He said that lady that wears the

6       glasses, but he said the B word.

7   Q.  He called her the B word?

8   A.  He said the bitch that wears the glasses.

9   Q.  And also called her a loud mouth?

10  A.  Yes.

11  Q.  What happened next?

12  A.  I went to the back to call the police because

13      we knew he was going to run out of the store

14      with the stuff.  I was just trying to give

15      the police time to get there.  So while I was

16      in the back, he knew I was on the phone

17      calling the police, because when I came back

18      up with a stick, he said, where are you going

19      with that stick?  So he was fumbling around.

20      In his pants, I seen the handle of his gun

21      that he had.  He said, I don't know where you

22      are going with that stick.  I'll blow your

23      mother fucking brains out.  So I took the

24      stick back.  So we came back and we was all

25      gathered around the door, and Mr. Smith was

R-29

1    trying to tell him if you want the stuff, you

2    can have the stuff, ain't no reason to hurt

3    nobody.  But he kept saying he would blow our

4    brains out and he wasn't scared of the mother

5    fucking police.

6    Q.   I want you to tell me exactly what was said.

7         I think the court and the jury will excuse

8         your language.  During this time frame that

9         he was threatening to blow your heads off,

10        did you take this threat seriously?

11   A.   Yes.

12   Q.   Did you feel he was capable of doing that?

13   A.   Yes, he scared us.

14   Q.   You testified that you saw what you thought

15        was a gun; is that correct?

16   A.   Yes.

17   Q.   Any doubt it was a gun?

18   A.   No.  He kept his hands on it.  When he was

19        fumbling I seen the handle of it.  He never

20        took his hands off it.

21   Q.   Did he, in fact, leave the store with

22        anything?

23   A.   He left with some clothes.

24        MR. BAILEY:  I think that's all the

25        questions I have at this time.

R-30

```
1                        CROSS EXAMINATION
2        BY MR. PORTER:
3        Q.   Ms. Jackson, my name is Jim Porter.  Let me
4             ask you.  Tell us again the first time he
5             came in -- Mr. Anderson came in the store?
6        A.   He was with a young lady.
7        Q.   A woman his own age?
8        A.   No, she was younger than him.
9        Q.   But she wasn't a child?
10       A.   She wasn't a child.
11       Q.   She had a baby?
12       A.   She had a baby.
13       Q.   Tell us what happened the first time they
14            came in the store.
15       A.   Like I say, they came in.  They was just
16            walking around looking in the store.  The
17            second time they came in, he sat up in the
18            window.
19       Q.   I am sorry.  Let me go back to that.  They
20            came in the store and looked around.  Did Mr.
21            Anderson look at anything?
22       A.   No.  He was standing there at first.  When
23            they first came in, he was just standing
24            there.
25       Q.   And they all left?
```

R-31

1    A.    They left.

2    Q.    Then what happened?

3    A.    They came right back about two minutes later.

4          All three of them came back in the store.

5          Like I say, sat in the window while she and

6          the little baby was looking around.

7    Q.    Then did she buy anything?

8    A.    No, she didn't buy anything.

9    Q.    Then what happened?

10   A.    They left back out.  A couple of minutes

11         later, he came back by himself.

12   Q.    Then what happened?

13   A.    He got to throwing stuff around on the rack.

14         He got to looking through the clothes.  He

15         asked about our manager, the loud mouth --

16         where the loud mouth lady at.  He was going

17         from rack to rack picking up stuff.

18   Q.    Then what happened?

19   A.    After he threatened to blow our brains out,

20         he backed up.  He wasn't afraid of the

21         police.  He knew I had called the police.  He

22         said he wasn't scared of the police.

23   Q.    When did you call the police?

24   A.    Say he came in about 11:25 --

25   Q.    I don't mean a time.  Let me go back.  You

R-32

```
1          testified he came in with the lady and baby
2          and looked around and left?
3     A.   No.  When he came in with the lady and baby
4          we hadn't called the police.  When he came
5          back the third time and got to throwing the
6          clothes around on the rack, I did ease to the
7          back and called the police because we knew he
8          was going to run out of the store with the
9          stuff.
10    Q.   You knew he was going to rob the store or you
11         knew he was going to run out of the store?
12    A.   With the stuff.
13    Q.   Let's go back.  Let's go back to the third
14         time again, and tell us very slowly precisely
15         what happened.
16    A.   He came in the store the third time.
17    Q.   Okay.
18    A.   He got to going through the clothes.
19    Q.   Which clothes in particular?
20    A.   At that time it was Brooklyn Express jeans
21         that we had.  It was sitting in the middle of
22         the rack -- of the floor up by the door.
23    Q.   Up by the front door when you walk in?
24    A.   It wasn't in the door.  When you come in the
25         door, you had a shirt rack right there.  And
```

R-33

1  then the Brooklyn Express jeans was right

2  here.  He was looking through those.  Like I

3  said, he threw five or six pairs over the

4  racks.  So I said, you can't do the jeans

5  like that.  That's when he got to asking

6  about our manager.

7  Q.  Let me ask you this.  When you told him he

8  couldn't do the jeans like that, was he

9  taking them off and throwing them up on the

10  rack?

11  A.  Yes.

12  Q.  Did he get mad when you told him that?

13  A.  Yes, he was upset.

14  Q.  When you asked about it?

15  A.  He was upset.  Then he asked about our loud

16  mouth manager.

17  Q.  Did you think he knew the manager?

18  A.  He acted like he did.  He described her to a

19  tee, so apparently he knew her.

20  Q.  You told him the manager wasn't working?

21  A.  Yes.

22  Q.  Then what happened?

23  A.  He proceeded around to the racks picking up

24  stuff.  He was like, why are y'all watching

25  me, stuff like that.  You could tell when

R-34

1          somebody was fixing to rob you or whatever.

2     Q.   Let's be careful with the word rob, because a

3          minute ago you said you knew he was going to

4          run out of the store with the stuff.

5     A.   You are acting like you don't understand me.

6     Q.   I just want to be real clear.  It is kind of

7          important.  You said a minute ago that you

8          knew he was going to run out of the store.

9     A.   With the merchandise, yes.

10    Q.   You went back to the back?

11    A.   Because our manager, she has an office in the

12         back.

13    Q.   And you called the police?

14    A.   Yes, I did.

15    Q.   What did you tell the police?

16    A.   I told the police we have a guy here that's

17         acting strange, and we know he is going to

18         run out of the store with the stuff.  If they

19         don't mind, can they send somebody out.

20    Q.   You came back with a stick?

21    A.   We have a little hook where we get stuff off

22         the racks with that's hanging up high.

23    Q.   Did he get even more agitated when you came

24         back out with a stick?

25    A.   I don't know if he got agitated more, but he

R-35

1        was already riled up.

2    Q.   How did he act when you came back with the

3        stick?

4    A.   When I same back with the stick, he said, I

5        don't know where you are going with that

6        mother fucking stick, because I'll blow your

7        brains out.  So I turned the stick back

8        around.  I put it back, and I came back.

9        Like I said, Mr. Smith was telling him, if

10       you are going to get the stuff, get the

11       stuff.  There is no need to try to hurt

12       anybody over the stuff.  We asked him if he

13       wanted the money.

14   Q.   What did he say?

15   A.   He got what he needed.

16   Q.   What was that?

17   A.   He got some Fubu, he got some Brooklyn

18       Express.  He got the clothing.

19   Q.   Did he take two pairs of blue jeans and two

20       shirts?

21   A.   He had a bunch of clothes in his hand is what

22       I am saying.

23   Q.   And you offered him the money?

24   A.   Yes.  He didn't want that.  He said he got

25       what he needed.  So Mr. Smith told him, there

R-36

1   is no need to hurt nobody, he got what he

2   wants so just leave.

3   Q.   Do you remember telling the police in a

4        statement you gave them that you saw the

5        handle of a gun?

6   A.   Yes, I did.

7   Q.   Then you went back and called the police?

8   A.   I called the police twice.

9   Q.   So you didn't think they were coming the

10       first time?

11  A.   They didn't come, because ten minutes later

12       he was still in the store, and the police

13       that did show up was a backup cop.  He was

14       backing somebody else up.

15  Q.   After you went back and called the police the

16       second time, did you then come back out and

17       confront Mr. Anderson again?

18  A.   He was gone the second time I called the

19       police.  He backed out, walked down the

20       street.  By the time the police came, he was

21       already gone.

22  Q.   Well then, you didn't see him back out of the

23       store?

24  A.   Yes, I did see him.  I said he backed out of

25       the store, walked down the street.  He was

R-37

```
 1              already gone by the time the police got

 2              there.

 3      Q.      So let me get this straight.  He is throwing

 4              the clothes over the rack, and you said

 5              something to him about it and he got mad?

 6      A.      Yes.

 7      Q.      What made y'all decide at that point that

 8              that's when he was going to run out of the

 9              store with the clothes?

10      A.      Because he had a bunch of clothes in his

11              hands.  He was just leaving clothes from rack

12              to rack.  If you are going to buy something,

13              you are not going to pick up just anything

14              that is not your size.  You are not just

15              going to throw folks' stuff on the racks if

16              you are going to buy it.

17      Q.      Is shoplifting a problem with y'all at

18              Weil's?

19      A.      Yes, it is, so that's how we know.

20      Q.      Was that a typical shoplifter?

21      A.      Every now and then.

22      Q.      He never pulled a gun out; is that right?

23      A.      I didn't tell them he pulled it out.  I said

24              I seen the handle.

25      Q.      Where did you see it?
```

R-38

```
1   A.   He had it right here in his pants.

2   Q.   What did he have on that day?

3   A.   That's been almost a year.  I can't recall

4        what he had on.  I know he had on blue jeans.

5        I don't remember what kind of shirt he had

6        on.

7   Q.   Was the gun just tucked in here in his belt?

8   A.   He didn't have on a belt I don't think.  Can

9        I stand up and show you how I seen the gun?

10            THE COURT:  Yes, ma'am.

11  A.   He had it like this.  This is the clothes.

12       It was like hanging on the rack.  He was

13       fumbling.  When he seen the stick, he had his

14       hand like this.  His shirt was right here.

15       The handle of the gun was right here, and his

16       pants was right here.  He had his hand like

17       this.  Like I say, he never took his hand off

18       the gun.

19  Q.   How do you know it was a gun, just out of

20       curiosity?

21  A.   I seen the handle of it.  Like I said, I

22       don't know what kind.  All I seen was the

23       handle.  I don't know if it was a real gun or

24       a fake gun.  Like I said, I seen a handle.

25       But you are not going to threaten to kill
```

nobody with your hands.

1

2  Q.   I am a little confused again.  Did you see

3       the gun?

4  A.   I said I seen the handle of the gun.

5  Q.   This was after you had called the police the

6       first time and came back with a stick?

7  A.   Yes.

8  Q.   Just for me, because I am a little slow.  If

9       you would one more time just very slowly go

10      through the sequence.  The third time he came

11      into the store, tell me what happened.

12 A.   Like I said, the third time he came into the

13      store, we got a shirt rack right here on the

14      front and the Brooklyn Express jeans sitting

15      on a long rack.  He started looking through

16      those first.  He was throwing the jeans on a

17      rack.  I said, you cannot throw the jeans

18      around like that.  So he started asking about

19      my manager --

20 Q.   That's when he started cursing?

21 A.   Yes.  So he was going from rack to rack.

22      Like I said, I went to the back.  I called

23      the police.  I told them it was a young man

24      here acting strange, could they send somebody

25      out.  They said okay.  I come back out with

R-40

1    the stick.  When I came out with the stick,

2    he was at another rack.  That's when I seen

3    him had his hand on the gun.  He said, I

4    don't know where you are going with that

5    stick, because I'll blow your mother fucking

6    brains out.

7  Q.  Then what happened?

8  A.  So he moved on up to the front.  That's when

9    he was talking to Paketa and Mr. Dagwood,

10    because they was up in the front.  Like I

11    said, Mr. Dagwood, we offered him the money.

12    He said he got what he wanted, so Mr. Dagwood

13    told him, if you got what you want, just

14    leave because it ain't no need to hurt nobody

15    over the stuff.  Mr. Dagwood walked around.

16    He went up to the front.  He backed up out of

17    the door and he left.  And I called the

18    police again.

19         MR. PORTER:  I have nothing further,

20    Judge.  Thank you.

21         THE COURT:  Anything else?

22         MR. BAILEY:  Nothing else from the

23    State.

24         THE COURT:  Thank you, ma'am.  You can

25    step down.

R-41

1          Call your next witness.

2              * * * * * * *

3              PAKETA MAYS

4          The witness, called by the State, after

5   having first been duly sworn to speak the truth, the

6   whole truth, and nothing but the truth, took the

7   stand and testified as follows:

8              DIRECT EXAMINATION

9   BY MR. BAILEY:

10  Q.    Good afternoon.  Can you please state your

11        name for the ladies and gentlemen of the

12        jury?

13  A.    My name is Paketa Mays.

14  Q.    How are you employed?

15  A.    I am employed with Weil's Clothing.

16  Q.    How long have you worked with Weil's

17        Clothing?

18  A.    Approximately eight years.

19  Q.    So I would assume by that that you were

20        employed with Weil's Clothing back in October

21        of last year?

22  A.    Yes, sir, I was.

23  Q.    And I want to direct your attention

24        specifically to the 26th of October of last

25        year.  Did anything unusual happen?  First of

R-42

1        all, let me ask you, were you at work that

2        day?

3   A.   Yes, sir, I was.

4   Q.   Did anything unusual happen during your time

5        at work that day?

6   A.   Yes, sir, it did.

7   Q.   If you could, just tell us what happened.

8   A.   On that morning a gentleman and a young lady,

9        and she had a baby, came into the store.  The

10       young lady and the baby came to the front of

11       the store to look at children's shoes while

12       the gentleman stayed toward the front of the

13       store toward the door.  She looked around.

14       We asked her if she needed help.  She said

15       she was just looking.  So she left, and then

16       the gentleman followed her out.  Then they

17       came back.

18   Q.   How long a time had expired?

19   A.   About five minutes or so.

20   Q.   So it wasn't long?

21   A.   Came back, and he was by himself.  He was

22       looking around up front where we have our

23       jeans located.  So he was going through the

24       jeans.  We asked if he was looking for a

25       certain size.  He pulls several jeans out and

R-43

1        threw them over the rack.  So Ms. Jackson

2        asked him was he going to purchase the jeans,

3        because customers don't usually throw jeans

4        over the rack like he was doing.

5    Q.  Let me stop you a second.  Was this the

6        second time you had seen him?

7    A.  Yes.

8    Q.  Were you aware if he had come back into the

9        store at any other time while you were

10       somewhere else, or do you know?

11   A.  No.

12   Q.  This was the second time you had seen him?

13   A.  Yes.

14   Q.  Go ahead.  You said Ms. Jackson asked him a

15       question.  Tell us what happened.

16   A.  Was he going to purchase the jeans, and he

17       said he was going to buy the jeans.  He was

18       throwing jeans over the rack, and she said

19       customers don't usually throw jeans over the

20       rack like he was doing.  So he proceeded to

21       pick out jeans and throw them over the rack.

22       He went from one rack of jeans to another

23       rack which had vests and T-shirts on it, and

24       he was looking through it.  Then he proceeded

25       back to the rack of jeans.  So she came up to

1    him and started putting the jeans back where

2    they were supposed to be.  He got kind of

3    agitated.  So she went to the back.

4    Apparently I believe she was calling the

5    police, because we have a phone in the back.

6    He mentioned that he didn't care about her

7    calling the -- excuse my language -- fucking

8    police.  So when she came back from the back

9    of the store, she picked up a clothes hook.

10   He said, I don't know what you are going to

11   do with that -- excuse my language -- fucking

12   hook; I'll blow your heads off.  So she

13   turned around and placed the hook back where

14   she had got it from.  So I was up front

15   toward the door and Mr. Smith was up front

16   towards the door leaning on a rack of

17   clothing.  So he was continuing to take

18   clothes off the rack and he was throwing them

19   over the rack and throwing some over his arm.

20   So he got into some words with Mr. Smith.  So

21   Mr. Smith tried to calm him down.  He told

22   him that whatever he wanted just take it and

23   leave out of the store.  So he walked out of

24   the store.  He walked across -- up the

25   sidewalk and then across the parking area,

R-45

```
 1              and he proceeded over into the apartment

 2              complex across the way.

 3      Q.      Let me ask you just a couple of preliminary

 4              questions, and then I am going to ask you

 5              about some of your testimony.  First of all,

 6              the person who you have described as doing

 7              all of these things and saying all of these

 8              things, is that person in the courtroom

 9              today?

10      A.      Yes, sir, he is.

11      Q.      If you could, please point him out for the

12              ladies and gentlemen of the jury?

13      A.      The gentleman sitting at the table in the

14              suit.

15              MR. BAILEY:  Let the Record reflect she

16              has pointed to the defendant in this case.

17      Q.      My second preliminary question is, did he

18              purchase these clothes, or did he take them?

19      A.      He took them.

20      Q.      Now, during the time that he was in the

21              store, you told us some of the things that he

22              had said to y'all.  I believe you testified

23              that he said he was going to blow your f'ing

24              heads off; is that correct?

25      A.      Yes, sir.
```

R-46

```
 1      Q.   Did you perceive his threats as being

 2           credible?  In other words, did you believe

 3           what he was saying?

 4      A.   Yes, sir, I did.

 5      Q.   Were you in fear of your life?

 6      A.   Yes, sir, I was.

 7      Q.   During the time that he was in the store, did

 8           you ever see or did he ever indicate that he

 9           was armed in any nature?

10      A.   He kept his hand down in the front of his

11           pants.

12      Q.   Did you ever see a weapon?

13      A.   No, sir, I didn't.

14      Q.   Did he ever indicate to you, aside from that,

15           that he had a weapon?

16      A.   He made the statement he would blow our

17           fucking heads off.

18      Q.   By that statement and by his, I think you

19           described it, as having his hand down his

20           pants, did you believe he had a weapon?

21      A.   Yes, sir, I did.

22      Q.   And these events all took place at the Weil's

23           Clothing Store in Montgomery?

24      A.   Yes, sir.

25                MR. BAILEY:  Judge, I believe that's all
```

R-47

```
1              the questions I have at this time.
2                      CROSS EXAMINATION
3      BY MR. PORTER:
4      Q.   Ms. Mays, my name is Jim Porter, and I have a
5           couple of questions for you.  You testified
6           that when Mr. Anderson came back in by
7           himself that he was just laying these clothes
8           up on the rack?
9      A.   Yes, sir.
10     Q.   At that point did you think he was like a
11          shoplifter?
12     A.   Yes, sir, I did.
13     Q.   Can you tell me why?
14     A.   Because usually our customers when they come
15          in, they ask for help or we ask them for
16          help, and usually customers don't throw
17          merchandise over the racks like he was doing.
18     Q.   Did you think he was being overly obvious as
19          a shoplifter?  I would think --
20               MR. BAILEY:  Judge, I object to what Mr.
21          Porter thinks.
22               THE COURT:  Rephrase your question.
23     Q.   Was that unusual behavior that you watched?
24     A.   Yes, sir, it was.
25     Q.   Tell me what was unusual about it.
```

R-48

1   A.   Him coming in first with a young lady and

2        then with the baby and she leaving and him

3        coming in by himself, and then him throwing

4        the jeans over the rack.  And when Ms.

5        Jackson asked him was he going to purchase

6        the merchandise, he said he was.  Then when

7        she went to put the jeans back into the

8        proper place, he got kind of agitated.

9   Q.   When he was flinging the blue jeans all

10       around, would you say he was drawing

11       attention to himself?

12  A.   Yes, I would.

13  Q.   You said you had worked there eight years?

14  A.   Yes, sir.

15  Q.   In your experience, do shoplifters typically

16       draw attention to themselves like that?

17  A.   Not in the manner he did.

18  Q.   Did it ever occur to you that maybe something

19       wasn't right about him, that he wasn't

20       exactly normal?

21  A.   After Ms. Jackson asked him was he going to

22       purchase the jeans and she began to put the

23       jeans back and he got agitated, he seemed

24       kind of angered like he may have been high on

25       something.  He got really agitated.

R-49

1    Q.   So you think he may have been under the

2          influence of something based upon his

3          behavior?

4    A.   Yes.

5    Q.   He started saying all of this stuff you said

6          about the manager?

7    A.   Uh-huh.

8    Q.   Did it seem like he knew the manager?

9    A.   He didn't ask for her by name.  He gave a

10        description of our manager.  He didn't give

11        her name.

12    Q.   In what sense was he asking for her and

13        asking about her?

14    A.   He asked where was the short light skinned

15        lady with the glasses.

16    Q.   Let me ask you this.  Was he asking that kind

17        of like if I said I can't believe you are

18        treating me this way, I would like to see so

19        and so manager?

20    A.   No, sir, he wasn't asking that.

21    Q.   Just tell us exactly what he said, if you

22        would.

23    A.   He said, where is the short white skinned

24        lady with the glasses?  That's what he asked.

25    Q.   But he got mad when he said it?

1   A.   He wasn't angry.  He just asked where she

2        was.

3   Q.   But it was at that point that you thought he

4        wasn't, for lack of a better word, right?  Is

5        that right?

6   A.   Not at that moment, not when he was asking

7        about the manager, no.

8   Q.   Then tell us what happened.  Ms. Jackson came

9        and started putting the clothing back, and

10       that's when he asked about the manager?

11  A.   No, he asked about the manager when he came

12       in the second time without the young lady.

13  Q.   That's the first thing he asked about?

14  A.   She was looking around, left out, and then he

15       started looking through the clothes.  Then he

16       asked where the manager was.

17  Q.   Then what happened?

18  A.   Then Ms. Jackson said she wasn't here.  Then

19       he proceeded going through the jeans and then

20       throwing them over.

21  Q.   Then what?

22  A.   Then he went from the jean rack and then he

23       went to several other racks that we have in

24       the store.  And Ms. Jackson came up and began

25       to put the jeans back.  She asked him was he

R-51

1       going to purchase the jeans, and he said,

2       yes, he was.

3  Q.  Had she gone to call the police at that

4       point?

5  A.  She left to call the police after she put

6       several of the jeans back.

7  Q.  After she called the police, she came back

8       with a clothes hook?

9  A.  Yes, sir.

10  Q.  Can you describe that or tell the jury what

11       that is?

12  A.  It is sort of like a rod, and has a wooden

13       handle, and the tip of it hooks.

14  Q.  Do you know why she would have brought that

15       stick back with her?

16  A.  I believe she was going to use it as a

17       weapon, but I can't say what she was

18       thinking.  But I believe she may have tried

19       to use it as a defensive weapon.

20  Q.  You testified though, I think, that he didn't

21       get really violent and didn't say he was

22       going to blow anybody's heads off until he

23       came back with the stick; is that right?

24  A.  Yes, sir.

25  Q.  What happened when he saw the stick?

R-52

1    A.   He said, I don't know where you are going

2         with that fucking stick; I'll blow your

3         fucking heads off.  That's when she turned

4         and placed the stick back where she had got

5         it from.

6    Q.   What did you think should have been done with

7         the stick?

8    A.   I thought she may try to strike him with it.

9    Q.   Let me ask you this.  You testified he seemed

10       under the influence or whatever.  If you

11       thought that maybe Ms. Jackson was going to

12       hit him with a stick, is it possible from

13       your perspective that he thought she was

14       going to hit him with the stick?

15         MR. BAILEY:  Judge, I am going to have

16       to object.  I have allowed some leniency

17       here, but he is getting into mental

18       speculation of two different people.

19         THE COURT:  Rephrase your question.

20    Q.   How close did she get to him with the stick?

21    A.   As far as you and I, maybe a little bit

22         closer.

23    Q.   He acted peculiar, but he did not say I am

24         going to shoot you until he saw her with a

25         stick?

R-53

1    A.    Uh-huh.

2    Q.    But you never saw a gun; is that right?

3    A.    No, sir.

4    Q.    When he said I am going to shoot y'all, what

5          happened then?

6    A.    I was up front at the door.  Mr. Smith was up

7          front where I was near a rack.  So he was

8          still at a rack of shirts.  So Mr. Smith told

9          him he could take what he wanted, just leave

10         out.

11    Q.    Did Mr. Smith offer him any money?

12    A.    No.

13    Q.    Didn't offer him the cash?

14    A.    No.

15    Q.    Then he left?

16    A.    He left with the clothing.

17    Q.    What did Ms. Jackson do?

18    A.    She went back to the back again and called

19          the police again.

20    Q.    After he left?

21    A.    Uh-huh.

22          MR. PORTER:  Thank you.

23          MR. BAILEY:  That's all the questions I

24    have, Your Honor.

25          THE COURT:  Thank you, ma'am.  You can

R-54

1          step down.

2                          * * * * * * * *

3                          EUGENE SMITH

4              The witness, called by the State, after

5     having first been duly sworn to speak the truth, the

6     whole truth, and nothing but the truth, took the

7     stand and testified as follows:

8                          DIRECT EXAMINATION

9        BY MR. BAILEY:

10       Q.    Good afternoon, sir.  Could you please state

11             your name for the ladies and gentlemen of the

12             jury?

13       A.    Reverend Eugene Smith.

14       Q.    Mr. Smith, how are you currently employed?

15       A.    With Alabama State University Police

16             Department.

17       Q.    You are a police officer for ASU?

18       A.    That's correct.

19       Q.    Prior to being employed with ASU, where were

20             you employed?

21       A.    Weil's Clothing Store.

22       Q.    That was a store located where?

23       A.    3871 South Court Street.

24       Q.    In Montgomery, correct?

25       A.    That's correct.

R-55

1    Q.   Were you employed there back on the 26th of

2         October of last year?

3    A.   Yes, I was.

4    Q.   I want to direct your attention back to that

5         particular date and ask you about what

6         happened while you were at work on that

7         particular day.  Did anything unusual happen

8         on that day?

9    A.   Yes, it did.

10    Q.   Can you tell us what happened?

11    A.   We had a young man and a female and a young

12         lady to come into the store and look around

13         at clothing.  They looked around.  We asked

14         them could we help them.  They said no.  So

15         they looked around and everything was okay,

16         and they walked out.

17    Q.   Did they purchase anything?

18    A.   No, not the first thing.

19    Q.   Did you see these individuals again?

20    A.   Yes.  They did come back in the store the

21         second time.

22    Q.   What did they do that time?

23    A.   They looked around, and he sat in the window,

24         in the left window of the store while she and

25         the baby walked around and looked at items.

R-56

1    Q.    Did they leave the store?

2    A.    Yes, they did.

3    Q.    Did they purchase anything at that particular

4          time?

5    A.    No, they did not.

6    Q.    Did you see either one of these individuals

7          again?

8    A.    Yes.

9    Q.    Did you see both of them?

10   A.    No.

11   Q.    Tell us who you saw.

12   A.    I saw the male come back in.

13   Q.    So he was by himself?

14   A.    He was by himself.

15   Q.    What happened at that point?

16   A.    Well, he came in and started looking.  We

17         asked him -- I think Ms. Jackson asked him if

18         she could give him some help.  He said, no, I

19         am just getting stuff I want.  He started

20         grabbing stuff off the racks, different types

21         of male clothing.

22   Q.    What happened next?

23   A.    After that she told him that customers don't

24         normally shop like that, not just taking

25         stuff off throwing them over the counter.

R-57

1    Q.  What happened?

2    A.  He became a little bit angry and violent.

3    Q.  When you say he became angry and violent,

4        tell us how.

5    A.  Because I was talking to my sister's husband.

6        I was talking to my sister's husband -- my

7        sister's daughter's husband.  That's who I

8        was talking to.  He had two young kids in

9        there.  He became very angry and cursing her,

10       and that's when my sister's daughter's

11       husband told him, hey, I don't like nobody

12       cursing around my kids.  That's when I became

13       alert.  When he told him that, he said, well,

14       you better get your F kids out of the store

15       then if you don't like that, if you don't

16       like what I have to say.

17    Q.  He told this man with his kids that?

18    A.  That's correct.

19    Q.  What happened next?

20    A.  Well, he was employed with Autauga County

21       Sheriff's Department at that time.  He was

22       talking about jumping him and doing all of

23       that.  I told him, no, it is best for you to

24       go outside with the kids.  I do not want the

25       kids to get hurt.  He walked outside with the

R-58

```
1              two kids.
2    Q.   Mr. Smith, you say he left with his kids.
3         What happened next?
4    A.   I walked outside and told him it is best he
5         take his kids from around the scene, because
6         I did not want them to get hurt in that
7         store.  He was not on duty, it was best for
8         him to get the young kids from around there.
9    Q.   Did you go back in the store?
10   A.   I went back in.
11   Q.   What did you see when you went back in?
12   A.   When I went back in, I stood up by Ms. Mays
13        at the front of the store.  Ms. Jackson was
14        in the front, and this is when he was telling
15        Ms. Jackson, what are y'all looking at, I am
16        not doing anything wrong, and he wasn't.  He
17        was just getting clothes off the rack,
18        snatching them off the rack, throwing them
19        over the counter.
20   Q.   What happened next?
21   A.   Ms. Jackson went to the back of the store,
22        and they had words back there, him and her.
23   Q.   Could you hear what was going on?
24   A.   Yes.
25   Q.   Tell us what was said.
```

R-59

1   A.   He told her, I don't care who you is or

2        anybody in here, I'll blow their f'ing head

3        off if anybody mess with me.

4   Q.   At some point in time did you see, I believe

5        it was Ms. Jackson, with some kind of hook

6        that is used in the store?

7   A.   Yes.

8   Q.   Let me ask you something about her and the

9        hook.  All of the things you have described

10       for us so far, did all of those happen before

11       she got the hook?

12  A.   Yes.

13  Q.   So him threatening to blow your heads off,

14       talking to the kids, telling him to get the

15       f'ing kids out, being agitated and upset, all

16       of that was before she had come out with the

17       hook?

18  A.   That's correct.

19  Q.   If you can pick up, you said you heard him

20       and Ms. Jackson back there having words, him

21       saying he was going to blow your f'ing heads

22       off.  Pick up there and tell us what happened

23       next.

24  A.   He was still at the clothing racks at the

25       shirts on the wall where she was standing.

R-60

```
 1              This is when she ran in the back to call the

 2              police.  Then he eased back up to the front

 3              of the store.  He shouted back in the store

 4              where she could not hear him, what is she

 5              doing back there?  I know the black B is

 6              calling the police.  I'll blow anybody's head

 7              off that mess with me.  That's when I took

 8              things serious and started talking to him

 9              trying to calm him down.

10    Q.        What happened next?

11    A.        He kept his right hand down in his trousers,

12              in his pants, in the inside of his pants.

13    Q.        Let me ask you a question about that.  At any

14              time did he indicate or show you that he was

15              armed?

16    A.        No, he never -- all he did was kept his hands

17              in his pants.

18    Q.        Did that mean anything to you, with him

19              keeping his hand in his pants like that?

20    A.        If he is going to blow somebody's head off,

21              it has got to be with some type of weapon.

22    Q.        When he said he was going to blow y'all's

23              f'ing heads off, did you take him seriously?

24    A.        Yes, I did.

25    Q.        Were you in fear of your life and everybody
```

R-61

1           else's life in the store?

2    A.   Yes, I was.

3    Q.   At some point, did he leave the store?

4    A.   Not until he got all the clothing he wanted.

5    Q.   At that point did he exit the store?

6    A.   No.  After I told him he could get anything

7           he wanted, he exited the store.

8    Q.   When he got the clothes this last time you

9           talked about right before he exited the

10          store, did he purchase those clothes?

11   A.   No, he did not.

12   Q.   I assume, obviously, you didn't give him

13         permission to take those clothes, did you?

14   A.   I did tell him he could take anything he

15         wanted in that store, but he didn't have to

16         take any of our lives or hurt anyone.

17   Q.   Because you felt threatened?

18   A.   That's correct.

19   Q.   Excuse me if I have asked you this.  But the

20         person that you described as doing all of

21         these things, saying all of these things,

22         taking the clothes, is that person in the

23         courtroom today?

24   A.   Yes, he is.

25   Q.   Could you please point him out for the jury?

R-62

1    A.    Right there.

2          MR. BAILEY:  Let the Record reflect the

3          witness has identified the defendant in this

4          case, Curtis Anderson.

5          I believe that's all the questions I

6          have.

7                    CROSS EXAMINATION

8    BY MR. PORTER:

9    Q.    Mr. Smith, when did this altercation occur

10         with the man who was in there with his

11         children?

12   A.    This happened when he was in there when he

13         came in the third time by himself.

14   Q.    Had the police been called at that point?

15   A.    No.

16   Q.    Well, I think you said that when the man

17         left, that you told him you didn't want him

18         to get hurt?

19   A.    I walked on the outside of the store when he

20         walked out with his two kids because he was

21         talking about what he was going to do,

22         jumping on him.  I told him, hey, it is best

23         you get the two kids and walk home.  So I

24         walked back into the store.

25   Q.    So he had told the man, if you don't like my

R-63

1             cussing, you better get out?

2    A.    Get your two kids out of the store, and I'll

3           take care of the store.

4    Q.    You weren't in fear of being robbed at that

5           point?

6    A.    Not at that point.

7    Q.    Now, both Ms. Mays and Ms. Jackson testify

8           that Mr. Anderson didn't get upset and start

9           cursing until Ms. Jackson came back with the

10         stick.

11   A.    That's when he got upset with her.

12   Q.    Did either one of them hear him get upset

13        with this other man?

14   A.    I am not sure.  They was in there.  They

15        should have.

16   Q.    Well, they didn't testify to it.  You heard

17        them.  How big is that store as compared to

18        this courtroom?

19   A.    About twice the size of this courtroom.

20   Q.    To be clear, it is your testimony that a man

21        who you knew came in the store and asked Mr.

22        Anderson not to curse?

23   A.    We were having a conversation.

24   Q.    We who?

25   A.    My cousin with the two kids.  We were

R-64

1          talking.

2     Q.   And what was Mr. Anderson cursing about at

3          that point?

4     A.   He was cursing Ms. Jackson, it looked like.

5          He was just cursing.  When she first told him

6          he could not throw the clothing over the

7          racks, that's when he became violent and

8          started cursing.

9     Q.   Did you say that the man you were talking to

10         witnessed all of that?

11    A.   Yes, he did.

12    Q.   You say he is a deputy sheriff?

13    A.   He is a sheriff in Autauga County.

14    Q.   In Autauga County?

15    A.   That's correct.

16    Q.   So did he call the police when he left?

17    A.   No, he did not.  He did not have his radio

18         on.  He was in his personal vehicle.

19    Q.   If he felt the need to call the police,

20         couldn't he have gone to a phone booth?

21              MR. BAILEY:  Judge, I am going to

22         object.  Once again, Mr. Porter is getting

23         into all this mental speculation of some

24         other person.  Mr. Smith can't testify to

25         that.

R-65

```
 1              THE COURT:  Sustained.
 2     Q.   Let me ask you this.  A deputy sheriff from
 3          Autauga County left the store, overheard all
 4          of this stuff, and did not call the police
 5          and did not attempt to arrest, stop, or
 6          whatever, Mr. Anderson; is that correct?
 7     A.   All he heard was him curse.  Hey, I know what
 8          I am doing, I am taking these clothes.  You
 9          don't know whether I am going to pay for them
10          or not.  Don't worry about it.  The first
11          time he cursed is when my cousin intervened
12          and said, hey, I don't like nobody speaking
13          like that in front of my children.
14     Q.   Ms. Jackson and Ms. Mays said that he said he
15          was going to pay for them initially, right?
16     A.   I never heard him say he was going to pay for
17          them.
18     Q.   They both testified to that.
19     A.   I never heard him say he was going to pay for
20          them.
21     Q.   When did he say I am going to blow your head
22          off?
23     A.   When Ms. Jackson told him, hey, you cannot be
24          taking those clothes off, doing all of this.
25          You need to let us help you, and we will help
```

R-66

```
 1        you get what you want, because people do not

 2        shop like that.

 3    Q.  Was that after she had gotten the stick?

 4    A.  Before.

 5    Q.  Let me ask you, because you heard this

 6        testimony, too.  Ms. Jackson clearly said he

 7        did not say he was going to blow anybody's

 8        head off until I came back with a stick?

 9    A.  He said it before that.

10    Q.  Ms. Mays said, he did not say he was going to

11        blow anybody's head off until Ms. Jackson

12        came back with a stick.  You say something

13        different?

14    A.  That's right.

15    Q.  Which one of y'all is confused?

16    A.  I don't know but I know what I heard.

17    Q.  If Ms. Jackson then said he did not say he

18        was going to shoot me until I came back with

19        a stick in my hand --

20    A.  You see, he said that several times.

21    Q.  But she said that he acted -- We have had

22        testimony he acted odd, that he was throwing

23        clothes, but both of the ladies said he did

24        not threaten us in any way until Ms. Jackson

25        came back with the stick?
```

R-67

1   A.   He did not threaten them, but he told my

2        cousin, hey, you better get your kids out of

3        here; if you don't, I'll --

4   Q.   Wait a minute.  Just a minute ago you said

5        you were not nervous about it at that point.

6   A.   No, I was not.  I told him to take the kids

7        out.  I walked on the outside with him.  I

8        was not nervous.  I would not have left those

9        two females in the store if I had any

10       intention he had a weapon on him.

11  Q.   Would you tell us again exactly about that

12       altercation?

13  A.   Like I said, when me and my cousin was

14       talking up front, these two kids was running

15       over the store.  They must have ran around

16       his leg or something.  He started -- got

17       angry because Ms. Jackson said, hey, can I

18       help you with shopping?  She said, customers

19       don't normally shop like that, taking all

20       those clothes off the racks at one time,

21       because our customers do not shop like that.

22       This is when he became very violent and said,

23       well --

24  Q.   Became what?

25  A.   Became violent and upset.

R-68

1    Q.  What do you mean?

2    A.  This is when he started talking loudly.

3    Q.  Is this when he started talking about the

4        manager?

5    A.  No.  This is when he said, I know what I am

6        doing, just leave me alone.

7    Q.  Then what happened?

8    A.  This is when I told my cousin, I said, hey,

9        why don't you take the two kids and ease on

10       out the store.

11   Q.  Did Mr. Anderson curse when he said I know

12       what I am doing?

13   A.  I am not sure.

14   Q.  I thought you testified a minute ago he

15       cursed and your cousin asked him to quit

16       cursing?

17   A.  He did curse.  That's when my cousin got

18       angry with him.  He said he didn't like to

19       hear that foul language in front of his kids.

20   Q.  So your cousin, the Autauga County sheriff,

21       asked him to quit cursing.  The guy said, if

22       you don't like my cursing, you just take your

23       children and leave, and that's what he did?

24   A.  He said, you better get them out of the

25       store.

1    Q.    And that's what he did?

2    A.    That's what I told him to do, because he did

3          not want to go.  But I was in fear they might

4          get into an altercation and the kids might

5          get hurt.  So I told him, take the kids and

6          go home.

7    Q.    Were you employed there as a security guard?

8    A.    No, salesman.

9    Q.    Salesman?

10   A.    That's correct.

11   Q.    And the sheriff left and didn't do anything

12         else?  You came back inside, and then what

13         happened?

14   A.    We were standing up front talking, me and Ms.

15         Mays, and Ms. Jackson was in the back.  This

16         is when she eased back there and called the

17         police after she saw he was still taking

18         clothes off the rack.

19   Q.    That's right.  She said he was taking clothes

20         off the rack and she went and called the

21         police and said he was going to run out of

22         here with these clothes?

23   A.    Yes.

24   Q.    She came back with a stick?

25   A.    She came back in the front and the stick was

R-70

1              hanging on the wall and she took it down.

2    Q.    What happened then?

3    A.    That's when he told her, where are you going

4          with that stick, you black B, I'll blow your

5          head off.

6    Q.    Was that the first time he said that, I am

7          going to blow your head off?

8    A.    No, he said that earlier when she was on the

9          phone, right by me, what is that black B

10         doing back there on the telephone, I know she

11         is going to call the police.  I'll blow

12         everybody's f'ing head off.

13   Q.    Where was Ms. Mays when he said that?

14   A.    Standing to the left of me, on the other side

15         of the door.

16   Q.    But she didn't hear him say that?

17   A.    Yes, she did.  She should have.

18   Q.    She testified, you heard her, you were

19         sitting there, she testified that he never

20         said he was going to blow anybody's head off

21         until Ms. Jackson came back with her stick?

22   A.    Well, he said that before.

23   Q.    That's what Ms. Jackson said, too.  So who is

24         telling the truth?

25              MR. BAILEY:  Judge, this has been asked

R-71

1    and answered.  We have covered this I have

2    counted four times now.

3        THE COURT:  Last time.  You can answer

4    that question.

5    Q.  It is your testimony he said it even though

6        the ladies said he did not?

7    A.  To the best of my knowledge.  It has been

8        almost a year.  To the best of my knowledge,

9        that's when he said it.

10   Q.  And what did you say to him at that point?

11   A.  I told him he did not have to hurt anyone in

12       the store, just take anything he wanted, and

13       it did not have to be this way, and walk out

14       with it.

15   Q.  What did he end up taking?

16   A.  Some male clothing, shirts and pants.

17   Q.  Do you remember the value?

18   A.  I think it was approximately a hundred and

19       thirty something dollars.

20   Q.  You never saw a gun?

21   A.  No, I never saw a gun.

22   Q.  I know you said he had these altercations and

23       everything.  Did he seem like a normal

24       customer to you?

25   A.  He did at first, but after I got close to

R-72

1        him, I could tell he had problems.

2    Q.   How could you tell?

3    A.   Because the way he was looking up at me

4        talking.  I was continually trying to tell

5        him, don't hurt anybody, take anything you

6        want.

7    Q.   Let me ask you this.  You knew he had

8        problems.  Do you mean that he was drunk, on

9        drugs, retarded.  I know --

10   A.   I did not smell any alcohol on him.

11   Q.   I know what you are trying to say.  You look

12       at somebody sometimes and you think something

13       is not right.  But can you tell us what came

14       to your mind about what wasn't right about

15       it?

16   A.   I figured he had to be a little high.

17   Q.   High?

18   A.   Uh-huh.

19   Q.   Under the influence?

20   A.   Not alcohol though, because I did not smell

21       any.  I could not smell any alcohol on him.

22       MR. PORTER:  Thank you.

23       MR. BAILEY:  That's all I have of this

24       witness.

25       THE COURT:  Thank you, sir.  You can

R-73

1          step down.

2                    * * * * * * *

3                      J. S. GRIER

4          The witness, called by the State, after

5     having first been duly sworn to speak the truth, the

6     whole truth, and nothing but the truth, took the

7     stand and testified as follows:

8                    DIRECT EXAMINATION

9     BY MR. BAILEY:

10     Q.    Can you please state your name for the ladies

11            and gentlemen of the jury?

12     A.    Detective J. S. Grier.

13     Q.    How are you employed?

14     A.    With the Montgomery Police Department.

15     Q.    What do you do for the Montgomery Police

16            Department?

17     A.    Robbery-Homicide investigator.

18     Q.    By Robbery-Homicide investigator, I assume

19            you investigate robbery and homicides; is

20            that correct?

21     A.    That's correct.

22     Q.    How long have you been doing so?

23     A.    I have been a detective for two years.

24     Q.    Get right to the point and ask you, did you

25            have any duties assigned to you in an alleged

R-74

1          robbery of Weil's Clothing Store in

2          Montgomery back on October 26?

3     A.   I was assisting Detective Hameed, the case

4          agent in this case.  The defendant was taken

5          into custody while he was off at the time,

6          and I interviewed and took a statement from

7          the defendant.

8     Q.   At some point during your assisting Detective

9          Hameed, a fellow investigator, I assume, did

10         you learn what exactly had happened at the

11         Weil's Clothing Store?

12    A.   From the case file that he had put together,

13         yes.

14    Q.   And did you ever become aware, and I think

15         you testified that you interviewed Mr.

16         Anderson; is that correct?

17    A.   That's correct.

18    Q.   Did you become aware of how Mr. Anderson was

19         found?

20    A.   Detective Hameed was canvassing the area with

21         the composite that you were speaking of

22         earlier and had some witnesses that stated

23         that that looked a lot like Mr. Anderson.

24    Q.   By composite, what is that?

25    A.   When the witnesses give a description and the

R-75

1        detective completes a composite photo from

2        the computer system of what their description

3        is.

4   Q.   Based on their description?

5   A.   Yes.

6   Q.   So somebody identified that photo. Is that

7        what led you to Mr. Anderson?

8   A.   That is what led Detective Hameed to Mr.

9        Anderson.

10  Q.   You testified in your assisting Detective

11       Hameed, I believe you stated he was off, that

12       Mr. Anderson was found and you were able to

13       interview him; is that correct?

14  A.   That's correct.

15  Q.   I want to show you what has been marked as

16       State's Exhibit Number One and ask you if you

17       can identify this particular item?

18  A.   That's the Miranda rights form where I read

19       the defendant his Miranda warning.

20  Q.   And if we could just go over this information

21       on this form real quick. I believe there is

22       some information here at the top. Can you

23       tell us what this information is?

24  A.   This is the defendant's name, what grade he

25       completed in high school, where I was

R-76

```
 1              interviewing him at was police headquarters,

 2              the date, the time, and the charge he was

 3              being questioned in reference to.

 4        Q.    As far as name -- well, let me ask you.  This

 5              information at the top, where did you get

 6              this information?

 7        A.    From the defendant.

 8        Q.    What exactly does it say as far as his

 9              completion of school?

10        A.    Twelfth grade education.

11        Q.    Now, there seems to be a paragraph under this

12              information that you just talked about.  What

13              is that?

14        A.    That is his Miranda rights.

15        Q.    Could you read those for us?

16        A.    (Reading) Before asking you any questions, I

17              must explain to you that you can remain

18              silent, that anything you say can be used

19              against you in court, that you can talk to a

20              lawyer first, that you have the right to the

21              advice and presence of a lawyer even though

22              you cannot afford to hire one.  If you cannot

23              afford to hire a lawyer and want to have one

24              present during interrogation, the court will

25              appoint one before we question you.  If you
```

R-77

1  want to answer questions now, you can do so,

2  but you can stop at any time.

3 Q. There appears to be what I would say is a

4  signature under that line; is that correct?

5 A. Yes, sir, that's my signature.

6 Q. By your signature being under that paragraph,

7  what does that indicate to you, if anything?

8 A. That indicates that I read him his rights.

9  No admission of guilt from him, just saying I

10  read him his rights.

11 Q. Do you recall doing that?

12 A. Yes, I do.

13 Q. There seems to be under your signature there

14  another paragraph.  Can you tell us what that

15  is?

16 A. That's -- it has kind of a dual purpose to

17  it.  It is a paragraph for the defendant to

18  understand what was just being read to him

19  and to kind of get a grasp of their mental

20  capability, if they can read and understand

21  exactly what is going on.

22 Q. Can you read that paragraph to us?

23 A. (Reading) I fully understand the foregoing

24  statements and do willingly agree to answer

25  questions.  I understand and know what I am

R-78

| | | |
|---|---|---|
| 1 | | doing.  No promises or threats have been made |
| 2 | | against me by anyone, and no pressure of any |
| 3 | | kind has been made against me by anyone. |
| 4 | Q. | Did Mr. Anderson read that? |
| 5 | A. | He read it aloud to me. |
| 6 | Q. | So he did read it aloud to you? |
| 7 | A. | Yes, he did. |
| 8 | Q. | There appears to be, again, some type of |
| 9 | | signature under that paragraph; is that |
| 10 | | correct? |
| 11 | A. | Yes, sir.  That's where the defendant signed |
| 12 | | it. |
| 13 | Q. | Did he sign that in your presence? |
| 14 | A. | Yes, he did. |
| 15 | Q. | Indicating he was willing to give you a |
| 16 | | statement and waive his Miranda rights? |
| 17 | A. | That's correct. |
| 18 | | MR. BAILEY:  Your Honor, I move to admit |
| 19 | | at this time State's Exhibit One and ask to |
| 20 | | publish. |
| 21 | | THE COURT:  Admitted. |
| 22 | | (State's Exhibit One was admitted |
| 23 | | into evidence.) |
| 24 | Q. | Prior to conversating with the defendant, did |
| 25 | | you make any threats to him? |

R-79

1    A.    No, I did not.

2    Q.    Did you make any promises that if he gave you

3          a statement things would go easy on him?

4    A.    No.

5    Q.    Or go tougher on him if he didn't give you a

6          statement?

7    A.    No.

8    Q.    Did he freely and voluntarily have a

9          conversation with you?

10   A.    Yes.

11   Q.    I want to show you -- let me ask you before I

12         do that.  During this conversation you had

13         with Mr. Anderson, was it recorded in some

14         fashion?

15   A.    Yes, it was.

16   Q.    How was that?

17   A.    Regular taped statement.

18   Q.    Was he aware it was being recorded?

19   A.    Yes, he was.

20   Q.    I want to show you what has been marked as

21         State's Exhibit Two, and I am going to ask if

22         you can identify this for us?

23   A.    This is the taped statement I took from the

24         defendant.

25   Q.    Is that item you are holding in your hand

R-80

1    there, does that accurately reflect the

2    conversation that you had with the defendant

3    back on that particular date?

4    A.    Yes, it does.

5            MR. BAILEY:  Your Honor, at this time we

6    move to admit and ask to play State's Exhibit

7    Number Two.

8            THE COURT:  Admitted.

9                (State's Exhibit Two was admitted

10                into evidence.)

11               (The taped statement, State's

12                Exhibit Number Two, was played for

13                the jury.)

14   Q.    Once again, Detective Grier, I'll ask you

15   does that conversation that we just heard

16   accurately reflect the conversation you had

17   with the defendant back on that particular

18   day?

19   A.    Yes, it does.

20   Q.    Just for the Record, what day was it that you

21   interviewed him?

22   A.    It was on a Sunday, I interviewed him

23   12-24-2000 at 2045 hours or 8:45 in the

24   evening.

25   Q.    During the conversation that you had with

R-81

1            him, of course, we heard the tape, did

2            anything jump out at you or indicate to you

3            that he had any problems understanding what

4            you were talking about or communicating with

5            you?

6   A.    No.

7   Q.    During the conversation that we heard on

8            there, I think you mentioned something about

9            money being taken.  Can you tell us about

10           that?

11  A.    It was a hundred and thirty-six dollars in

12           clothing.  Like I said, I was not the case

13           agent on the case.  I read the report.  From

14           what I read, I thought it was a hundred forty

15           dollars in currency also taken, but they were

16           speaking of the hundred forty dollars in

17           clothes.

18  Q.    Was that a mistake on your part?

19  A.    Yes, it was.

20  Q.    Based on the evidence that had been gathered

21           in this case, was there an arrest made of the

22           person who y'all believed had committed this

23           robbery?

24  A.    Yes.

25  Q.    Who was arrested?

1    A.    Curtis Anderson, the defendant.

2              THE COURT:  Mr. Porter.

3                    CROSS EXAMINATION

4    BY MR. PORTER:

5    Q.    Detective, do you know in this case was there

6          any physical evidence?  Was there a videotape

7          or anything in the store?

8    A.    I don't believe so.

9              MR. PORTER:  That's all I have.

10             THE COURT:  Anything else?

11             MR. BAILEY:  Nothing else of this

12         witness, Your Honor.

13             THE COURT:  Thank you, sir, you can step

14         down.

15             MR. BAILEY:  Judge, that's all the

16         witnesses we have.

17             THE COURT:  Ladies and gentlemen, the

18         State has rested.  We will take a short

19         break.  Please follow these instructions.

20         Please do not discuss this case with anyone,

21         allow anyone to discuss this case with you.

22         Please don't discuss the case among

23         yourselves.  Please return directly back to

24         this courtroom in fifteen minutes, that will

25         be at 3:10, we will be prepared to continue

R-83

1    at that time.

2              (The following occurred outside the

3              presence and hearing of the jury:)

4        THE COURT:  Do you want to make some

5    motions for the Record, Mr. Porter?

6        MR. PORTER:  At this time we move that

7    the State did not present a case by which the

8    jury could find the defendant guilty as a

9    matter of law.  We ask for a directed verdict

10   or dismissal.

11       THE COURT:  That's denied.  Let's talk

12   in terms of charges.

13       MR. PORTER:  We would ask in this case

14   that -- he confessed to a theft.  There is

15   testimony of two people that he never made a

16   statement of threat until Ms. Jackson came

17   back with a stick in her hand.  We would

18   offer that based upon his mental diagnosis

19   and the fact that I think at least two of the

20   three witnesses said that he was under the

21   influence of something, that it was that

22   stick that provoked him to say that he had a

23   gun.  And we would ask for a jury charge of

24   Theft III in this case.  The property, I

25   believe, was a hundred thirty-nine dollars.

R-84

1    That's what I believe he did in this case.

2         THE COURT:  Well, I think there is some

3    factual dispute that will allow lesser

4    includeds, in light of the statement he has

5    made.  I don't think you need to say

6    anything.  I think I am going to charge them

7    on Robbery I, arguably Robbery III because of

8    a threat with one person not seeing a weapon.

9    I suppose they could believe his story

10   entirely and conclude it was a shoplifting

11   based upon the statement, so I'll charge on

12   all three of those, Theft III, Robbery III

13   and Robbery I.

14        MR. BAILEY:  I am sorry, Judge.  Did you

15   say one person say they didn't see a weapon?

16   Well, that's correct.  They did all indicate

17   he had one or they thought he had one.

18        THE COURT:  He said it orally, so that

19   is correct.  I am going to let the jury

20   decide so they will have the choice of

21   Robbery I, Robbery III, or Theft III.

22             (A brief recess was taken, and then

23              the following occurred in the

24              presence and hearing of the jury:)

25        THE COURT:  Ladies and gentlemen, the

R-85

1    State has rested, meaning they have presented

2    all the evidence they are going to present.

3    It is now time for the defense to call any

4    additional witnesses or present any

5    additional evidence they want to present.

6         MR. PORTER:  At this time, all we would

7    like to do is admit into evidence a

8    psychological report done by Dr. Renfro.

9         THE COURT:  That's been stipulated to

10   and admitted, so rather than Dr. Renfro being

11   here to testify as to the mental evaluation

12   he did regarding this defendant, his report

13   is being admitted in lieu of his testimony.

14   That will be admitted as Defendant's Exhibit

15   One.

16             (Defendant's Exhibit One was

17              admitted into evidence.)

18        THE COURT:  Does the defendant rest at

19   this time?

20        MR. PORTER:  Yes, sir.

21        THE COURT:  Same motions will be timely

22   filed.  Same ruling.

23        Ladies and gentlemen, that's all the

24   evidence you will hear in this case.  You

25   will have the opportunity to review this

R-86

1    report during your deliberations.  It is now

2    time for the closing remarks of the lawyers.

3    And the State will go first and last because

4    they have the burden of proof.  Mr. Bailey.

5        MR. BAILEY:  Ladies and gentlemen, in

6    the United States of America we all live

7    under a set of laws.  It is a code of laws

8    which allows certain conduct and prohibits

9    certain conduct.  In the State of Alabama we

10   have codified those laws in what we call the

11   Code of Alabama.  I have a book here on this

12   table that's just full of laws which

13   restricts things we can do in society.

14       These laws were written by the

15   Legislature so that we as citizens of the

16   State of Alabama can live in a civilized

17   society.  Contained within this very book

18   here is a law against robbery, taking

19   people's property by force or threat of

20   force.  Obviously, there is good reasons for

21   that law.

22       That's why we are here today.  We are

23   here today because on October 26 of last

24   year, this man comes into the Weil's Clothing

25   Store here in Montgomery, as I told you in

1    opening, an establishment obviously located

2    here in Montgomery as a business to make

3    money to provide for people's livelihood.

4    This man enters and takes property without

5    paying for it.  Not only does he take

6    property without paying for it, he makes the

7    people who are employed at Weil's Clothing

8    believe he has a gun.  He threatens their

9    lives.  He indicates to them that he has a

10   gun.  And under the laws of the State of

11   Alabama, ladies and gentlemen, that is

12   robbery in the first degree.

13           THE COURT:  Mr. Porter.

14           MR. PORTER:  Mr. Bailey is right.  There

15   are more laws in this code book than I can

16   keep up with, and it is my job to do that.

17   But let me also say this.  In this case, as

18   you heard, Mr. Anderson is charged with

19   robbery in the first degree.  What I am going

20   to ask you to do -- this is the first time I

21   haven't come back and said, I want you to

22   come back with a verdict of not guilty.  I

23   think that Mr. Anderson committed theft of

24   property in the third degree.

25           Y'all heard his confession.  He went to

1    the police station.  He said I took the

2    clothes.  They were worth a hundred

3    thirty-nine dollars.

4         Just a minute ago we admitted into

5    evidence a psychological evaluation that was

6    done of Mr. Anderson.  I requested that it be

7    done some time ago, and the Judge issued an

8    order that there be an examination done.

9    Based on things I knew about his family and

10   past, I did not think Mr. Anderson had the

11   mental capacity to stand trial.  I didn't

12   believe he could understand the charges that

13   could help in his defense.

14        I am going to mention a few things in

15   this, but I am going to ask y'all to read it,

16   because I am not an expert.  The report came

17   back and basically said that, among other

18   things, that he might need some assistance in

19   this case in having things explained to him,

20   so we had a trial.  One thing in here is, I

21   think we all know he went into Weil's that

22   day.  He had been in there previously with a

23   lady and her child.  We all know he took I

24   think it was two pairs of blue jeans and two

25   shirts that was worth a hundred thirty-nine

1    dollars.

2        The testimony of Ms. Jackson and Ms.

3    Mays was that, yes, it was peculiar that he

4    was throwing all these clothes up on the

5    rack, and the first time Ms. Jackson said

6    something to him, he got obviously upset, and

7    that he kept asking where is that loud mouth

8    woman, the one with the glasses.  Who he was

9    referring to, I believe, is the manager who

10    is a friend of his mother's.  At that point

11    he got riled up.  At that point, you heard

12    the testimony that Ms. Jackson went back to

13    the back, called the police and said this guy

14    is going to run out of the store with this

15    stuff.  She came back with, I call it a

16    stick, a clothing hook, whatever it is, and

17    two of the three witnesses clearly said up

18    until the time he saw that stick, if y'all

19    remember Ms. Mays said, yes, he could have

20    thought he was going to be hit with the

21    stick.  He never said, I am going to rob you,

22    blow your heads off, your f'ing heads, or

23    anything else until he saw the stick.  And

24    Mr. Smith said that, too.  He also said there

25    had been -- his was a little more confusing,

1   but he also agreed on that point with the

2   stick.

3        You know, I submit to you that if I were

4   in a store and if I were shoplifting and an

5   employee came out with a stick in her hand, I

6   doubt that I would start shrieking at her

7   that I was going to shoot her.  But Mr.

8   Anderson, this is one of the first things I

9   told y'all and one of the first things Mr.

10  Bailey said, there is something peculiar

11  about Mr. Anderson, and there is.

12       Y'all go back there and read his mental

13  evaluation and consider not under the

14  circumstances of what you would do, but what

15  he might have done.  Two of the witnesses

16  said, I knew there was something not right

17  about him, I thought he was high, under the

18  influence.

19       The law says absolutely that to commit a

20  robbery you don't have to have a gun, that

21  you just have to make someone in fear of

22  their life or make them think you have a gun.

23  Ms. Jackson said she thinks she saw a gun

24  handle.  I don't think she did.  I think she

25  might have seen a wallet, a phone, or I think

R-91

1    she may have been excessively upset. I am

2    not blaming anybody for being upset in a

3    situation like that. If I had somebody in a

4    store or anywhere else where they were

5    cursing like that, I would be nervous. But

6    the very clear testimony was that he did not

7    do anything that approached a robbery. You

8    heard them all say that they thought he was

9    going to run out of the store with them. He

10    was a shoplifter, but not a very smart one, a

11    shoplifter who was impaired, mentally

12    impaired, and I think probably impaired by

13    drugs, who then became agitated, irrationally

14    so, and said things that made those

15    circumstances appear to be, at least to one

16    of the witnesses, a robbery.

17    In trying to define justice or trying to

18    mete out justice, we have provisions for

19    people that truly are not competent to stand

20    trial, and in this case our doctor found he

21    was competent to stand trial. I don't

22    believe he was competent, nor did he intend

23    to commit a robbery. If y'all will listen to

24    his tape again, his confession which he

25    freely gave, he said, yeah, I took the

1    clothes, but, no, I didn't have a weapon.

2    And, you know, I don't know with whatever he

3    said if he even remembers he said it.

4         We are talking about a hundred

5    thirty-nine dollars in clothes, regardless of

6    what he is convicted of.  But theft of

7    property and robbery in the first degree are

8    worlds apart in their application.  I am not

9    going -- I trust y'all are going to look at

10   the mental evaluation and see what it says.

11   And after you read that, think about these

12   circumstances.  The man is not right, and,

13   yes, he got ruffled the first time.  He may

14   have intended to steal the clothes from the

15   moment he went in there.  I think in his

16   statement he said he saw them in the window.

17   That's not where they were, but he wanted

18   some clothes and he was being nutty anyway

19   throwing the clothes over the rack.  He got

20   mad.  Then a woman comes back with a stick.

21   One of the employees said he could have

22   perceived that as a weapon she had and he

23   just, for lack of a better word, freaked out

24   because he is not like you are or I am.

25        What I have to ask you in this case is

R-93

1    to look at that and come back with a verdict

2    of the theft of property in the third degree.

3    That does not ameliorate in my mind what

4    happened to the people in the store.  I think

5    they were understandably scared that day.  I

6    would have been.  But they were scared by

7    someone that two of them knew something

8    wasn't right about by looking at him, but

9    they didn't know the extent of it and they

10   couldn't have understood, nor been expected

11   to at the time.  But what you can do in

12   making this right, in my opinion, is to come

13   back with a verdict of guilty of theft, not

14   of robbery.

15        I appreciate y'all's time today.  Thank

16   you very much.

17        MR. BAILEY:  Ladies and gentlemen, I

18   want to clear up something for you because I

19   know some of this may be confusing, a lot of

20   legal jargon.  Legal terms have been used

21   throughout the course of this trial regarding

22   the defendant's mental capability and mental

23   issue.  I want to explain something to you

24   based on the evidence in this case.

25        The defendant has not pled not guilty by

1    reason of insanity.  That issue has already

2    been decided.  The defendant has already been

3    decided to be competent to stand trial, and

4    you will find that in this report that Mr.

5    Porter has admitted, and that's the reason I

6    don't have any problem admitting this report.

7    A mental health professional has said, and

8    you can read the report, the defendant knew

9    the difference between -- well, let me just

10   read it so I don't misquote.

11        (Reading) The information reviewed did

12   not indicate at the time of the alleged

13   offense Curtis Anderson was suffering from

14   any psychological disorder or condition that

15   would have impaired his ability to know right

16   from wrong or appreciate the criminality of

17   his actions.

18        Ladies and gentlemen, that sums it all

19   up right there.  But we don't even have to

20   get to that issue, because I think all of us

21   who deal with the criminal judicial system

22   realize at some point in time that people who

23   go out and commit crimes of this nature,

24   there is something wrong with them.

25   Obviously they are not a normal member of

1   society.  There is something wrong with all

2   these people.  But do we take these

3   individuals and say, oh, because I am out

4   there smoking dope or I am abusing alcohol or

5   I am doing this, do we take that and say, all

6   right, it is okay for you to go out there and

7   rob people or you go out there and steal

8   things.  Absolutely not.  There is no excuse.

9   That's why, as I have been telling you the

10  whole time, we live in an orderly society

11  with rules.  We can't say it is okay for one

12  person to go out and take things from a

13  business, from people's livelihood because he

14  was drinking or he was on dope and say one

15  person who wasn't, you are going to be

16  punished for it different.  It doesn't make

17  sense, ladies and gentlemen.

18      Something else I find interesting about

19  this report, first of all, I think all the

20  witnesses have said they didn't smell alcohol

21  on him, that he didn't appear drunk or

22  anything like that.  Mr. Porter has told you

23  throughout this case that he felt he was

24  abusing drugs, that he was high.  Look at

25  what Mr. Anderson told the mental health

R-96

1    professional about that.  He said, yes, I do

2    marijuana but on a very infrequent basis.

3        Let's talk about Robbery I and the

4    lesser includeds that Judge Reese, as

5    required by law, is going to instruct you on.

6    He is going to instruct you on Robbery I.  I

7    think by now we pretty much know what Robbery

8    I is.  He is going to tell you in the robbery

9    the victims don't actually have to see a

10   weapon.  The only thing that has to be

11   established is, one, they believe he either

12   has a weapon or he has threatened some type

13   of force against them where they believe

14   their lives are in danger.

15       Ladies and gentlemen, the testimony in

16   this case is clear.  All three of these

17   witnesses who testified felt their lives were

18   in danger, felt he either had a gun because

19   he was reaching.  You remember them all

20   talking about him reaching indicating like he

21   had a gun.  Even the females who testified

22   said he was doing that prior to Ms. Jackson

23   going to get the hook.  He was indicating he

24   had a gun.  It doesn't matter.

25       This whole hook business doesn't matter,

1    ladies and gentlemen.  The fact is you have

2    got to look at the defendant's actions.  Did

3    he threaten the imminent use of force is what

4    the law says.  Did he threaten?  Yeah, he

5    threatened.  He said, I am going to blow your

6    f'ing heads off.

7         Mr. Smith tells us that while he was in

8    the store one of the first few times that

9    there is a relative of his in there with kids

10   and Mr. Anderson, the defendant, is in there

11   cussing saying, well, if you don't like my

12   cussing, you better get your f'ing kids out

13   in the parking lot.

14        Let's step back in this case for just a

15   minute, because a lot of times you can get

16   real involved in whether the defendant is

17   crazy, but let's step back a little bit and

18   look at this case and let's look at what

19   really happened in this case.

20        Why does the defendant come in and out

21   of the store?  Casing the store, to see who

22   is in there, who is watching, what is going

23   on.  Something else that's kind of unusual

24   about the number of times the defendant comes

25   in the store.  The first two times he comes

R-98

1    in with someone.  He comes in there with a

2    female.  Where is she the third time?  I

3    don't know.  Out in the car.  I don't know

4    where she is.

5        Ladies and gentlemen, if you step back

6    and you look at what this defendant did, his

7    actions on that day, it is obvious and clear

8    he knew exactly what he was doing.

9        Let's take a look also and compare what

10   these witnesses said happened and his

11   statement.  Let's look at that just a minute,

12   because you are going to have the statement

13   and you can take it back there.

14       One of the reasons I wanted to admit his

15   statement into evidence is because he gives a

16   statement saying, yeah, I went by back there

17   and I went into that store, I took a couple

18   of pairs of clothes, and I ran out.

19   Detective Grier plain as day said, did you

20   talk to anybody?  No.  You just went in

21   there, took some clothes, and ran out?  Yep.

22   Does that make sense?  That's not what

23   happened, not according to all these

24   witnesses.  So why would the defendant in

25   this case say all I did was go in there and

1    basically shoplift, which is what the defense

2    is wanting you to convict him of, of course.

3    They want you to convict him of shoplifting

4    for obvious reasons.  The defendant knows the

5    differences between robbery in the first

6    degree and shoplifting.  He knows when he is

7    talking to the police, oh, by this time I

8    have got four people that have found me, they

9    have identified me.  It took them two months

10   to find him, but, oh, they must know who I

11   am.  So instead of just saying I didn't do

12   it, I better come up with something.  Okay, I

13   did do it, but all I did was shoplift.  I

14   didn't say anything to anybody.  I went in

15   there and I took clothing and I left.  He

16   knows the difference between theft of

17   property third degree and robbery in the

18   first degree.  He is smart.  So I want y'all

19   to look at that, and I want you to consider

20   that.

21        So what does that leave us with?  Well,

22   you have got the law.  You have got some

23   evidence here.  But the one thing that I

24   can't take away from you, Mr. Porter can't

25   take away from you, the defendant can't take

1    away from you, and even Judge Reese can't

2    take away from you in this case that you are

3    going to be allowed to take back in that jury

4    deliberation room and that's your God-given

5    common sense, ladies and gentlemen. I want

6    you to take that common sense, and I want you

7    to look at this case, what happened, what

8    these hard working people of our community

9    said happened and what this guy said

10   happened, and I want you to compare those,

11   and I want you to determine who is telling

12   the truth.

13        I am asking you to go back there and

14   find him guilty of what he is charged with.

15   You swore to uphold the law. When I asked

16   you if any of y'all had any problems with

17   this law, you all by your silence affirmed

18   that you didn't have a problem with it. I

19   want you to uphold the law. Don't let him

20   get off on a theft of property in the third

21   degree.

22        Ladies and gentlemen, you also have the

23   option of looking at robbery in the third

24   degree. I am asking you don't let him off on

25   that either. He did what he did, and he

1    should be held responsbile for it.  The Judge

2    is going to tell you basically that robbery

3    in the third degree, there would have to be

4    no indication that there was a weapon

5    involved, and that's totally contradictory to

6    what this case says.

7         One last thing I want to leave you with.

8    I want you to read this report as Mr. Porter

9    asked you to.  The defendant oddly enough

10   says in his statement to the police, why

11   would I have to go in there and steal?  I am

12   a working man and I pay for everything I get

13   in life.  Detective Grier thought that was a

14   very odd statement to make, because he just

15   admitted he went in there and took clothing.

16   Read this report.  The defendant tells the

17   psychiatrist in here, it says that at best he

18   had odd jobs cutting yards every once in a

19   while.  This man didn't work for a living.

20   He worked for a living, yes, feeding off

21   others, stealing property from Weil's

22   Clothing Store.  That's how he worked for a

23   living.

24        Ladies and gentlemen, you have the

25   evidence in this case.  The Judge is going to

1    instruct you on the law.  There is no other

2    choice in this case once you look at the law

3    and you look at the testimony in this case

4    but to find this defendant guilty of what he

5    has been charged with, and that's robbery in

6    the first degree.

7         THE COURT:  Ladies and gentlemen, these

8    lawyers have completed their responsibility.

9    They have presented to you for your

10   consideration all of the relevant evidence

11   relating to this case.  I am preparing to

12   complete my final responsibility in

13   explaining the law.  You are preparing to

14   assume your final duty and responsibility,

15   and that is deliberating over the facts and

16   the evidence and returning a verdict based

17   upon the evidence as you find it to be and

18   the law that I give to you in this case.

19        So what should you consider as evidence,

20   and what should you not consider as evidence?

21   I'll come back to that in just a minute.

22        Ladies and gentlemen, you as members of

23   the jury are bound by the evidence in this

24   case along with the reasonable and natural

25   inferences that you with common sense as men

R-103

1    and women may draw from the evidence in this

2    case.  You are also bound by the law that

3    applies, and you should not capriciously

4    disregard the evidence as you find it to be

5    or the law that I give to you in reaching

6    your verdict in this case.  You must not base

7    your verdict upon any preconceived ideas what

8    would be a popular or unpopular verdict in

9    this case either.  And you have no duty to

10   compromise your honest convictions in order

11   to agree with the rest of the jury in

12   reaching a verdict in this case.

13       This morning when we went through the

14   selection process, I told you this case comes

15   to us by way of an indictment.  This

16   indictment, again, is the legal paperwork

17   that puts the defendant on notice of the

18   charges against him.

19       As to this indictment, this defendant

20   has pled not guilty.  A plea of not guilty

21   places the burden upon the State of Alabama

22   to prove his guilt beyond a reasonable doubt.

23   Before a conviction can be had, the State

24   must satisfy you of the defendant's guilt

25   beyond a reasonable doubt.

R-104

1      What is a doubt which would justify an

2   acquittal?  A doubt which would justify an

3   acquittal must be an actual doubt, not just a

4   mere possible doubt.  A reasonable doubt is

5   not a mere guess or surmise, and it is not a

6   capricious doubt.  If after considering all

7   of the evidence in this case, you have an

8   abiding conviction for the truth of the

9   charge, then you are convinced beyond a

10  reasonable doubt, and it would be your duty

11  to find the defendant guilty.

12     On the other hand, evidence which merely

13  gives rise to a surmise or a conjecture or a

14  suspicion of guilt is not sufficient in order

15  to base a conviction upon it.  The reasonable

16  doubt that entitles an accused to an

17  acquittal is not a mere fanciful, vague,

18  conjectural, or speculative doubt, but a

19  reasonable doubt arising from the evidence,

20  the lack of evidence, or a conflict in the

21  evidence, and remaining after a careful

22  consideration of the testimony such as

23  reasonable, fair-minded, conscientious men

24  and women would entertain under all the

25  circumstances.

R-105

1        The State is not required to convince

2    you of the defendant's guilt beyond all

3    doubt, but simply beyond a reasonable doubt.

4    Beyond a reasonable doubt means a doubt for

5    which a reason can be given.

6        As I told you, you are the sole and

7    exclusive judges of the evidence.  So what

8    should you consider as evidence, and what

9    should you not consider?  First let me tell

10    you what you should not consider as evidence.

11        Number one, this indictment that we have

12    referred to, again, this indictment is not

13    evidence of guilt or innocence.  It is simply

14    the legal paperwork to put the defendant on

15    notice of the charges against him.  Secondly,

16    any rulings that I may have made during the

17    course of this trial are also not evidence.

18    And, furthermore, you should not take a cue

19    from any ruling that I have made as to my

20    suggestion of how you should decide this

21    case, because that is your function, that is

22    not the Court's function.  Finally, any

23    arguments, statements, or comments that these

24    lawyers have made during the course of the

25    trial, they are also not evidence for your

R-106

1    consideration.  Their arguments are intended

2    to help you understand what the evidence is,

3    but they are in and of themselves not

4    evidence for your consideration.

5        So what is the evidence?  The evidence

6    consists of three things, ladies and

7    gentlemen.  First, the sworn testimony of the

8    witnesses.  When they came into court, they

9    were placed under oath.  The answers to

10   questions they gave you, that testimony is

11   evidence.  Secondly, any physical exhibits or

12   documents, for example, you have that report,

13   I believe some other letter, and then this

14   tape, those are all articles of evidence, and

15   that is evidence for your consideration.

16   And, thirdly, the presumption of innocence,

17   it is a piece of evidence for your

18   consideration.

19       And the law of this state says this

20   defendant is presumed innocent.  The

21   presumption of innocence is a piece of

22   evidence to be considered by you, along with

23   the rest of the evidence in this case.  The

24   presumption of innocence goes with the

25   defendant to your verdict unless the evidence

R-107

1  convinces you beyond a reasonable doubt of

2  the proof of each and every element necessary

3  to show the guilt of the defendant.  That is

4  the evidence, and it is upon the evidence

5  that your verdict should be based.

6      Now, you are the sole and exclusive

7  judges of the evidence.  You are also the

8  sole and exclusive judges of the credibility

9  of the witnesses.  And in passing upon the

10  credibility of the witnesses, you have the

11  right to consider any bias, interest, or

12  prejudice that might have been exhibited to

13  you while the witnesses testified.  You also

14  have the right to consider the demeanor of

15  the witnesses on the stand; that is, their

16  appearance, how did they appear to you, how

17  did they testify.  You also have the right to

18  consider what basis they had for testifying,

19  whether or not they had the opportunity to

20  discern the facts about which they testified.

21  These things you may look into in passing

22  upon the credibility of all of the witnesses

23  in this case.

24      And you have one other tool, and that is

25  your common sense.  You have the right to use

1    that in passing upon all of the evidence

2    presented in this case.

3         Ladies and gentlemen, in this case this

4    defendant has been charged with the offense

5    of robbery in the first degree, as you know.

6    And the law automatically requires that other

7    lesser included offenses be considered by you

8    in reaching your deliberations or in reaching

9    the conclusion of your deliberations.

10        So what I am going to do is give you

11   instructions on certain laws in this state,

12   and I am going to start with robbery in the

13   first degree, and then I am going to give you

14   instruction dealing with robbery in the third

15   degree, and then theft of property in the

16   third degree.  So if you will just bear with

17   me, and I'll go through all three of those

18   instructions.

19        It might be helpful if I first start

20   with the verdict form that I'll come back and

21   share with you in my final remarks, but the

22   reason I am going to start with that is

23   because these are the possible verdicts you

24   have, and it forms an outline for what I am

25   going to explain to you.

R-109

1    You will have four possible verdicts,

2    and they are these:  We, the jury, find the

3    defendant guilty of robbery in the first

4    degree; or in the alternative, We, the jury,

5    find the defendant guilty of robbery in the

6    third degree; or in the alternative, We, the

7    jury, find the defendant guilty of theft of

8    property in the third degree; or in the

9    alternative, We, the jury, find the defendant

10   not guilty.  So those are the choices you are

11   going to have based upon the evidence

12   presented here.

13       I am going to begin first with robbery

14   in the first degree.  I think you will notice

15   as I go through this, in comparing robbery in

16   the first degree with robbery in the third

17   degree, the difference is going to be whether

18   or not you are armed, so many of the same

19   terms I use will be identical.  There will be

20   a question of whether or not there is a

21   weapon that's used, and I will, again,

22   explain that to you.

23       I am going to begin with robbery in the

24   first degree.  A person commits the crime of

25   robbery in the first degree if in the course

1   of committing a theft he uses or threatens

2   the imminent use of force against the person

3   of the owner of the property or any person

4   present with the intent to overcome that

5   person's physical resistance or physical

6   power of resistance and in so doing he is

7   armed with a deadly weapon.  Therefore, in

8   order to convict, the State must prove the

9   following elements of robbery in the first

10  degree:  That the defendant committed or

11  attempted to commit theft of property, which

12  in this case is alleged to be the clothes;

13  number two, that in the course of committing

14  or attempting to commit the theft of

15  property, the defendant either used force

16  against the person of the victim in this case

17  with the intent to overcome his or her

18  physical resistance or physical power to

19  resist, or threatened the imminent use of

20  force against the person of the victim with

21  the intent to compel the acquiescence to the

22  taking of or escaping with the property;

23  number three, that the defendant was armed

24  with a deadly weapon.

25      A person commits the crime of theft of

R-111

1    property if he knowingly obtains or exerts

2    unauthorized control over the property of

3    another with the intent to deprive the owner

4    of his property.

5         A deadly weapon is a firearm or anything

6    manifestly designed, made, or adapted for the

7    purpose of inflicting death or serious

8    physical injury.

9         A person acts intentionally with respect

10   to a result or to conduct when it is his or

11   her purpose to cause that result or to engage

12   in that conduct.

13        And a person acts knowingly with respect

14   to conduct or to a circumstance when he is

15   aware that his conduct is of that nature or

16   that the circumstance exists.

17        In this case you have heard evidence as

18   to a potential weapon, and I will tell you as

19   a matter of law, if you conclude that, that a

20   handgun is a deadly weapon, if you conclude

21   the defendant was armed.

22        So if you find the State has proven each

23   of these elements beyond a reasonable doubt,

24   it would be your duty to find the defendant

25   guilty of robbery in the first degree.  If

R-112

1    you find the State has failed to prove either

2    one or more of these elements, then you need

3    to next consider the offense of robbery in

4    the third degree.  Again, the definitions I

5    am going to give you are going to sound

6    exactly like robbery in the first degree.

7    The one thing that will be noticeably absent

8    will be that you don't have to have a weapon

9    in robbery in the third degree.

10        Again, these are the instructions, and

11    this will, again, refresh your memory on what

12    I just told you on robbery in the first

13    degree.

14        A person commits the crime of robbery in

15    the third degree if in the course of

16    submitting a theft he uses or threatens the

17    imminent use of force against the person of

18    the owner of the property or any person

19    present with the intent to overcome that

20    person's physical resistance or physical

21    power of resistance.  Therefore, in order to

22    convict, the State must prove beyond a

23    reasonable doubt the following elements:

24    Number one, that the defendant committed or

25    attempted to commit a theft of property,

R-113

1    which in this case is alleged to be the

2    clothes; and, number two, that in the course

3    of committing or attempting to commit the

4    theft, the defendant either used force

5    against the person of the owner of the

6    property with the intent to overcome his

7    physical resistance or physical power to

8    resist or threatened imminent use against the

9    person of the owner of the property with the

10   intent to compel the acquiescence to, the

11   taking of, or the escaping with the property.

12        Again, a person commits the crime of

13   theft of property if he knowingly obtains or

14   exerts unauthorized control over the property

15   of another with the intent to deprive the

16   owner of his property.

17        And a person acts intentionally with

18   respect to a result or to a conduct when his

19   or her purpose is to cause that result or to

20   engage in that conduct.

21        And a person acts knowingly with respect

22   to conduct or to a circumstance when he is

23   aware that his conduct is of that nature or

24   that the circumstance exists.

25        If you find the State has proven each of

R-114

1    those elements beyond a reasonable doubt, it

2    would be your duty to find the defendant

3    guilty of robbery in the third degree.

4        If you find the State has failed to

5    prove either one or more of those elements,

6    then you next need to consider the offense of

7    theft of property in the third degree.  So I

8    am going to share that definition with you,

9    but one more time, the difference between

10   robbery in the first degree and robbery in

11   the third degree is the use of a weapon,

12   threatening the use of a weapon.  And I have

13   some more instructions that I'll share with

14   you momentarily about that.

15       With respect to theft of property in the

16   third degree, this is what the law says.  A

17   person commits the crime of theft of property

18   if he knowingly obtains or exerts

19   unauthorized control over the property of

20   another with the intent to deprive the owner

21   of his property.  The theft of property which

22   does not exceed two hundred fifty dollars in

23   value constitutes theft of property in the

24   third degree.

25       To convict, the State must prove the

1    following elements beyond a reasonable doubt:

2    That the defendant knowingly obtained or

3    exerted unauthorized control over the

4    property of another, and more specifically

5    the clothing that we talked about; number

6    two, that the property in question did not

7    exceed two hundred fifty dollars in value;

8    and, number three, that the defendant acted

9    with the intent to deprive the owner of his

10    property.

11        One acts with intent to deprive another

12    of his property when he acts with the purpose

13    of causing that result.

14        And a person acts knowingly with respect

15    to conduct or to a circumstance when he is

16    aware his conduct is of that nature or that

17    the circumstance exists.

18        And the term obtains or exerts

19    unauthorized control over property includes,

20    but is not necessarily limited to, the taking

21    or carrying away, or the sale, conveyance, or

22    transfer of title to or interest in or

23    possession to property.

24        If you find the State has proven each of

25    those elements beyond a reasonable doubt, it

1   would be your duty to find the defendant

2   guilty.

3       If you find the State has failed to

4   prove either one or more of those elements

5   after considering the other charges, it would

6   be your responsibility to find the defendant

7   not guilty.

8       Some additional instructions of law that

9   are also proper statements of law for your

10  consideration are these.  In a robbery in the

11  first degree case, the robbery victim does

12  not actually have to see the weapon to

13  establish the element of force.  Reasonable

14  belief that the robber is armed is

15  sufficient.  To be convicted of robbery in

16  the first degree, an accused need not be

17  armed with a deadly weapon or dangerous

18  instrument where he possesses any object

19  reasonably believed to be a deadly weapon or

20  a dangerous instrument or represents in some

21  manner that he has one.

22      The victim does not have to see a

23  weapon.  His belief that the robber is armed

24  is sufficient.  It is not necessary to prove

25  that the defendant displayed a weapon during

R-117

1    a robbery or that he actually had a weapon in

2    order to sustain a conviction for robbery in

3    the first degree.

4        In order to sustain a conviction for

5    first degree robbery, the accused need only

6    represent in some manner that he has a deadly

7    weapon or instrumentality; thus, the test to

8    be applied is a subjective one which focuses

9    on the victim's reaction to the threat of the

10   robber.

11       Those are instructions dealing with

12   robbery distinction, ladies and gentlemen.

13       Now, one final instruction.  Because

14   there has been some mention of intoxication,

15   whether by alcohol or by drugs, and with

16   respect to that, this instruction may have

17   meaning to you.

18       Intoxication of the defendant, whether

19   voluntary or involuntary, may be considered

20   by the jury whenever it is relevant to negate

21   an element of the offense charged, such as

22   intent.  However, being unaware of a risk

23   because of a voluntary intoxication is not

24   relevant in considering whether the defendant

25   acted recklessly where recklessness is an

R-118

1    element of the crime charged.

2        Ladies and gentlemen, the law says one

3    other thing, and that is that your verdict

4    must be unanimous.  It takes all twelve of

5    you to agree to return a verdict in favor of

6    the State.  It takes all twelve of you to

7    agree to return a verdict in favor of the

8    defendant.

9        I suggest when you go out to begin your

10   deliberations, that you select one from among

11   you to act as the foreperson of the jury.

12   That individual will have no greater weight

13   in the jury's deliberations, but will simply

14   preside over the jury's orderly

15   deliberations.  The second function of the

16   foreperson will be to sign the verdict form

17   that we send back with you in this case.

18       And in this case, as I mentioned

19   earlier, there are four possible verdicts,

20   and they are these.  You must choose one of

21   these.  We, the jury, find the defendant

22   guilty of robbery in the first degree; We,

23   the jury, find the defendant guilty of

24   robbery in the third degree; We, the jury,

25   find the defendant guilty of theft of

R-119

1   property in the third degree; or in the

2   alternative, We, the jury, find the defendant

3   not guilty.  Those are the four possible

4   verdicts.

5       Ladies and gentlemen, you can retire to

6   begin your deliberations.  We will send in

7   the evidence including these reports

8   momentarily, but you can retire to our

9   deliberation room, it is to your immediate

10  right, and begin your deliberations.

11      THE COURT:  State and defense satisfied?

12      MR. BAILEY:  State satisfied.

13      MR. PORTER:  Yes, sir, we are satisfied.

14          (Jury deliberating.)

15              * * * * *

16              VERDICT

17      THE COURT:  Would the foreperson stand

18  and read the verdict of the jury into the

19  record, please, sir?

20      THE FOREPERSON:  We, the jury, find the

21  defendant guilty of the offense of Robbery I.

22      THE COURT:  Thank you, sir.  Ladies and

23  gentlemen, I want to thank you for your

24  service on this case.  Thank you for your

25  service throughout the course of the week.

1           Ladies and gentlemen I have been asked

2      to poll you, which means all I am going to do

3      is ask each of you if this is your verdict so

4      I can make sure it is unanimous.

5                  (The jury was polled, to which each

6                  responded in the affirmative.)

7           THE COURT:  Let the Record reflect all

8      twelve jurors responded affirmatively.  It is

9      a unanimous verdict.

10          Ladies and gentlemen, thank you for your

11     service.  You are excused.

12                 (The following occurred outside the

13                 presence and hearing of the jury:)

14          THE COURT:  Sheriff, if you would take

15     Mr. Anderson into custody, please.  His bond

16     will be revoked.

17          He is adjudicated guilty based upon the

18     jury having found him guilty.  And sentencing

19     will be set October 18th.

20          Mr. Porter, make application for

21     pre-sentence investigation.

22          MR. BAILEY:  Judge, do you want to go

23     ahead and sentence since it is an automatic

24     sentence?

25          THE COURT:  You probably need the

R-121

1    priors.  We will just set the sentence on

2    that date.

3                    * * * * * *

State of Alabama
Unified Judicial System
SAMPLE
Form ARAP 13       Rev. 6/98

**CERTIFICATE OF COMPLETION**
**REPORTER'S TRANSCRIPT**

Page Number

*122*

**TO:** The Clerk of the Court of Criminal Appeals          Fax: (334) 242-4689
P. O. Box 301555
Montgomery, Alabama 36130-1555

**Criminal Appeals Case Number          CR _____ - _____**

*Curtis Lamario Anderson*                    v.  *State of Alabama*
**Appellant's Name**                              **Appellee**

On appeal from the:   [X]  Circuit Court of
                      [ ]  District Court of    *Montgomery* County
                      [ ]  Juvenile Court of

**Trial Court Case Number** *CC 2001-359*

**Notice of Appeal Date** *11-1-01*

I, *Jackie Bonnett*, certify that I have this date completed and filed with the clerk of the trial court an original and three copies of a true and correct transcript of all proceedings in the above referenced case that were reported by me and were specifically designated by the appellant for inclusion on the Reporter's Transcript Order.   The transcript, which is numbered serially in the upper right-hand corner of each page, begins with a copy of the Reporter's Transcript Order and an index of both the exhibits and the testimony of the witnesses.  The original transcript concludes with the original of this notice and the copies of the transcript conclude with copies of this notice.  The page number appearing in the upper right-hand corner of this certificate is the last page of my portion of the transcript in this case.

Done this the *21st* day of *December*, *2001*.

_____
Court Reporter

_____
**FILING AND SERVICE OF THIS FORM:**    Pursuant to Rule 11(b), A.R.App.P., the court reporter should file a copy of this certificate with the Clerk of the Court of Criminal Appeals and should serve copies of the certificate on counsel for the appellant or the appellant if he or she is not represented by appellate counsel, the attorney general and the district attorney, unless the appeal is from a municipal appeal, in which event a copy of the form should be served on the municipal prosecutor rather than the attorney general and district attorney.

1

```
 1                  IN THE FIFTEENTH JUDICIAL CIRCUIT
                     IN AND FOR MONTGOMERY COUNTY
 2                        MONTGOMERY, ALABAMA

 3    STATE OF ALABAMA

 4

 5
      vs.                              CRIMINAL ACTION
 6                                     CASE NO. CC-01-359

 7    CURTIS LAMARIO ANDERSON

 8

 9
      _____/
10              COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS
                        OCTOBER 18, 2001
11                MONTGOMERY COUNTY COURTHOUSE
                        COURTROOM 4-B
12

13
      BEFORE:  THE HONORABLE EUGENE W. REESE
14             CIRCUIT JUDGE

15                           APPEARANCES
      FOR THE STATE:
16    SCOTT GREEN, ESQUIRE
      DEPUTY DISTRICT ATTORNEY
17    FIFTEENTH JUDICIAL CIRCUIT
      MONTGOMERY, ALABAMA
18
      FOR THE DEFENDANT:
19    JAMES H. PORTER, III, ESQUIRE
      MONTGOMERY, ALABAMA
20

21

22
                          JAN GOSS
23               OFFICIAL COURT REPORTER

24

25
```

NOV 2001
FILED
Melissa Rittenour
Circuit Clerk

```
 1                         PROCEEDINGS
 2         THE COURT:  Mr. Anderson, you have had a chance to
 3    review the presentence report.  State has a motion?
 4         MR. GREEN:  Move to invoke the Habitual Offender Act.
 5    We show two prior felonies.
 6         THE COURT:  Motion granted.  Mr. Anderson, do you have
 7    anything to say before sentence of law is pronounced?
 8         THE DEFENDANT:  Yes, sir, I would like to say God as my
 9    witness, I wouldn't lie by the law of God.  He is a strong
10    God.  And I didn't have a gun when I went in those people's
11    store.  And I'll leave it like that.
12         THE COURT:  Okay.
13         MR. GREEN:  Your Honor, we would also move to invoke
14    the weapons enhancement in this case.
15         THE COURT:  Mr. Anderson, you will be sentenced to a
16    term of imprisonment for life.  You're ordered to pay court
17    costs, fifty dollars to the Victims' Compensation Fund.
18    Restitution?
19         MR. GREEN:  Five hundred fifty dollars.
20         THE COURT:  That's ordered.  You have a right to
21    appeal.  Good luck, sir.
22
23                    (Court was adjourned.)
24
25
```

3

1

2          CERTIFICATE OF COMPLETION OF REPORTER'S TRANSCRIPT

3          IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA
                      FIFTEENTH JUDICIAL CIRCUIT
4

5    STATE OF ALABAMA

6
     VS.                                CASE NUMBER CC-01-359
7
     CURTIS LAMARIO ANDERSON
8
                    *  *  *  *  *  *  *  *  *
9          I, JAN GOSS, OFFICIAL COURT REPORTER FOR THE FIFTEENTH

10   JUDICIAL CIRCUIT OF ALABAMA, HEREBY CERTIFY THAT I HAVE THIS

11   DATE COMPLETED AND FILED WITH THE CLERK OF THE TRIAL COURT

12   THE ORIGINAL AND THREE COPIES OF A TRUE AND CORRECT

13   TRANSCRIPT OF ALL THE EVIDENCE AND MATTERS TAKEN IN THE

14   ABOVE-STYLED CAUSE.  ALL PAGES ARE NUMBERED SERIALLY,

15   PREFACED BY AN INDEX AND ENDING WITH THE NUMBER APPEARING AT

16   THE TOP OF THIS CERTIFICATE.

17          I FURTHER CERTIFY THAT A COPY OF THIS CERTIFICATE HAS

18   THIS DATE BEEN SERVED ON THE CLERK OF THE APPELLATE COURT,

19   THE DISTRICT ATTORNEY'S OFFICE, THE ATTORNEY GENERAL'S

20   OFFICE, AND COUNSEL FOR THE DEFENDANT.

21          DATED THIS _14th_ DAY OF _November_, 2001.

22

23                      _____
                        JAN GOSS
24                      OFFICIAL COURT REPORTER

25